634 So.2d 412 (1994)
Davey Paul CLEMENT
v.
Brent S. GRIFFIN, et al.
Davey Paul CLEMENT
v.
Brent S. GRIFFIN, et al.
Mickey MAITRE
v.
Dr. Harry BOYER, et al.
Albert WEIDENBACHER, III
v.
Dr. Harry BOYER, et al.
Mark ABADIE, et al.
v.
DELGADO COMMUNITY COLLEGE, et al.
Alton SARTIN
v.
Brent S. GRIFFIN, et al.
Henry J. GASPARD, Jr.
v.
STATE of Louisiana, et al.
Paul AYO, Jr.
v.
DELGADO COMMUNITY COLLEGE Through the STATE of Louisiana, et al.
The STATE of Louisiana, et al.
v.
The FORD MOTOR COMPANY, et al.
Kevin REYNOLDS
v.
DELGADO COMMUNITY COLLEGE, et al.
Nos. 91-CA-1664, 92-CA-1001, 93-CA-0591 to 0597 and 93-CA-0648.
Court of Appeal of Louisiana, Fourth Circuit.
March 3, 1994.
Writs Denied May 20, 1994.
*419 Daniel E. Becnel, Jr., Becnel, Landry & Becnel, Reserve, for plaintiff/appellee (Davey Paul Clement).
Robert H. Matthews, DeRussy, Bezou, Matthews & Solomon, New Orleans, for plaintiff Alton Sartin.
Robert J. Caluda, Law Offices of Robert J. Caluda and Associates, New Orleans, for plaintiff/appellee (Mickey Maitre).
Joseph V. Dirosa, Jr., New Orleans, for plaintiff/appellee (Paul Ayo, Jr.).
Mary-Elizabeth Paltron, Bagert & Trinchard, New Orleans, for plaintiffs/appellants (State of Louisiana and Delgado Community College).
Charles L. Chassaignac, Carmelite M. Bertaut, Kenneth J. Servay, Douglas L. Grundmeyer, David R. Richardson, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, for defendant/appellant (The Goodyear Tire & Rubber Co.).
Gerald E. Meunier, Gainsburgh, Benjamin, Fallon, David & Ates, New Orleans, for plaintiffs/appellees (Mickey Maitre, Albert Weidenbacher, III, Mark Abadie, Douglas Faust, Patrick Prigmore, Kevin Reynolds, Alton Sartin, Henry J. Gaspard, Jr., Paul Ayo, Jr.).
Ivan David Warner, III, Carimi Law Firm, Metairie, for plaintiff Albert Wiedenbacher, III.
Michael T. Pulaski, Robert W. Maxwell, Gina S. Montgomery, Pulaski, Gieger & LaBorde, New Orleans, for defendant/appellee (Ford Motor Co.).
Frank J. D'Amico, Darla D'Amico, New Orleans, for plaintiffs/appellees (Henry Gaspard, Jr. and Kevin Reynolds).
Before LOBRANO, ARMSTRONG and PLOTKIN, JJ.
PLOTKIN, Judge.

I. PROCEDURAL HISTORY

This appeal follows trial court judgments on liability and damages in nine consolidated cases arising from an April 25, 1986 single-vehicle accident caused by the blowout of the right rear tire on a van carrying members of the Delgado Community College baseball team. The plaintiffs filed suit in negligence against Brent S. Griffin, the student coach who was driving the van at the time of the accident, and against Delgado and the State of Louisiana (Delgado/State), as well as various public boards and individuals connected with the school. Additionally, the plaintiff filed suit in strict products liability against *420 both Goodyear Tire and Rubber Company, which manufactured the tire, and Ford Motor Company, which manufactured the van. The claims against the public boards and the individuals were dismissed by agreement of the parties prior to trial. Delgado/State also filed suit in strict products liability against Ford and Goodyear.
The case was bifurcated by agreement of the parties, and the liability and damages portions were tried separately. The case against the private defendants was tried to a jury, while the case against the public defendants (Delgado/State) was tried to a judge as required by LSA-R.S. 13:5105.
Following the liability portion of the trial, the jury returned a verdict holding Goodyear 60 percent liable for causing the accident and Delgado/State 40 percent liable. Ford was exonerated of any liability. The trial judge subsequently adopted the jury's findings on liability.
Thereafter, the trial judge released the liability jury and announced his intention to try the damages portion of the case to a different jury. Several of the parties filed writ applications challenging that decision to this court and to the Louisiana Supreme Court. The supreme court eventually refused the parties' request for a mistrial and ordered the trial judge to try the damages portion to a new jury, citing judicial economy.
A different jury was selected, and the plaintiffs presented their damage cases back-to-back to the same jury. The jury decided the cases one at a time, returning lump-sum damage awards in the following amounts:

 Mickey Maitre $2,002,717.75
 Davey Clement 1,000,000.00
 Alton Sartin 450,000.00
 Mark Abadie 374,839.50
 Douglas Faust 85,276.75
 Patrick Prigmore 76,673.08
 Henry Gaspard 55,000.00
 Kevin Reynolds 35,000.00
 Paul Ayo, Jr. 25,590.00

The trial judge adopted the jury's assessment of damages for each of the individual plaintiffs.
The liability judgment and all of the damage judgments have been appealed. Both Goodyear and Delgado/State appeal the liability judgment, each challenging both the finding that it was liable for the accident and the finding that Ford has no liability for the accident. Both Goodyear and Delgado/State also seek further review of the trial court's decision to dismiss the original jury. Additionally, Delgado/State challenges the trial judge's decision to adopt the jury findings on liability. Plaintiff Davey Clement joins Goodyear and Delgado/State in challenging the finding that Ford has no liability for the accident.
On the damages issues, Goodyear and Delgado/State challenge all of the awards, claiming each one is excessive for various reasons. Goodyear claims generally that all the damage awards are about twice the highest award a reasonable jury could have entered. Additionally, Goodyear and Delgado/State challenge the trial judge's refusal to grant their motions to sever the various damage trials and his refusal to allow Delgado/State to present evidence of payment of medical expenses. Furthermore, Goodyear and Delgado/State contest various evidentiary rulings made by the trial judge during the damage trials. Plaintiffs Douglas Faust, Patrick Prigmore, Henry Gaspard, and Kevin Reynolds each filed a cross appeal, seeking an increase in their quantum awards.

II. FACTS

The accident occurred as the Ford Club Wagoneer van, which was carrying 13 passengers, travelled north on Interstate 59 (I-59) north of Slidell en route to Meridian, Mississippi for an intercollegiate baseball game. When the blowout occurred, Griffin was unable to maintain control; Griffin held a Class A driver's license, but not a Class C chauffeur's license. During the process of the accident, the vehicle rolled over at least three times, finally landing on its wheels in the grassy median of I-59. Several of the passengers were ejected from the vehicle during the accident; two of the passengers were under the van after the accident. The plaintiffs suffered injuries of various degrees, which will be detailed in the "DAMAGES" section of this opinion.
*421 At the time of the accident, the van and the tires were owned by Delgado/State. The tires, including the tire which blew out, were part of the original equipment of the van. The mileage on the van at the time of the accident was 24,013. Ten of the passengers filed suit; two of the passengers and the driver did not file suit.

III. LIABILITY

The general liability issues to be decided in this appeal include the following:
A. The judge's dismissal of the original jury
B. The judge's adoption of jury findings
C. Goodyear's liability
D. Delgado/State's liability
E. Ford's alleged liability

A. The judge's dismissal of the original jury

Goodyear and Delgado/State challenge the propriety of the judge's dismissal of the original jury, an action contrary to the mandatory provisions of La.C.C.P. art. 1562, relative to bifurcation of trials, which provides, in pertinent part, as follows:
B. If a defendant has been found liable by a jury, the court shall proceed with the trial on the remaining issues before the same jury unless all parties consent to a trial before a different jury.
(Emphasis added.) The appellants argue that they were prejudicially affected by the trial judge's failure to follow the mandatory provisions of the above article.
In response to writ applications on this issue, the Louisiana Supreme Court made the following statement:
Granted. Although the trial court erred in discharging the jury, judicial economy and C.C.P. art. 2164 dictate that we order the trial court to proceed with a new jury to complete the damages portion of the case; otherwise the writ is denied.
The plaintiffs claim that this issue is no longer appealable because of the above statement, since the Supreme Court cited La. C.C.P. art. 2164, which gives an appeals court broad power to enter any judgment which is just under the circumstances. They claim that any error by the trial judge must now "yield[] to the larger question of what is just and fair at this time."
The appellants' argument that this issue remains appealable despite the above statement is based on a second statement from the Louisiana Supreme Court, made in response to a second writ application concerning the appealability of an "interim decree" on liability entered by the trial judge. In that writ decision, the Supreme Court stated as follows:
Denied. Under the unusual circumstances of this case, the "interim decree" rendered by the trial judge is not an appealable partial judgment under La.Code of Civ.P. art. 1915. Therefore, an appeal need not be taken from that decree at this stage in the proceedings. The trial judge is to proceed with a new jury to complete the damage portion of the case as previously ordered. Thereafter, an appeal may be taken from a judgment on the entire case.
The appellants claim that the last sentence of this second statement suggests that the trial court's decision might yet be appealable, despite the court's previous statement. Delgado/State claims that the parties were deprived of due process by the trial judge's actions in this case, and that the fact the jury was replaced caused recurring problems during the damages portion of the trial, which compounded the trial judge's error. Likewise, Goodyear argues that the error was prejudicial and reversible. Neither party suggests an appropriate remedy.
Although we agree with the appellees' argument that the trial judge erroneously dismissed the jury in this case, over the objections of the parties, that error has already been considered both by this court and the highest court in this State. The Supreme Court's original statement, which cites judicial economy and the power of appellate courts to enter any decree which is "just," decided this issue. The Supreme Court's subsequent statement that the entire case could be appealed after the damages portion of the case had been tried obviously referred to the parties' rights to appeal the result of *422 the case; that statement cannot reasonably be interpreted to open the door for further appellate court consideration of the trial judge's dismissal of the original jury. We decline the appellees' invitation to reconsider this issue.

B. Judge's Adoption of Jury Findings on Liability

Under the provisions of LSA-R.S. 13:5105, "[n]o suit against the state or a state agency or political subdivision shall be tried by jury." Delgado/State claims that the trial judge violated this article and allowed the jury to decide the liability issues against it by adopting the jury findings despite statements that he believed that Ford should have some liability in the case. Ford, on the other hand, argues that any change in the liability percentages by the judge would have no effect on its liability, which must be tried by a jury.
Thus, we must consider the scope of appellate review to be applied to a judgment from a bifurcated trial, in which the trial judge was charged with the responsibility of deciding the case against the public defendants and the jury was charged with the responsibility of deciding the case against the private defendants.
The appellate standards of review in jury and non-jury trials are the same appellate courts are to decide whether the trial court judgment was manifestly erroneous or clearly wrong. Under the manifest error/clearly wrong rule, an appellate court may reverse a trial court judgment only after applying the following two-part test:
1) The appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and
2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).
Stobart v. State, through DOTD, 617 So.2d 880, 882 (La.1993). Thus, a court judgment may be manifestly erroneous only if the record reveals that the trial court judgment is not reasonable. Id.
The function of a jury is to determine facts, apply the legal instructions articulated by the court, and render a responsive verdict. The verdict is the product derived from the consideration of all the competing and conflicting evidence in the dispute in light of the legal issues presented by the case. Great deference on appeal is given to the findings of fact made by a trial judge or jury.
The function of a trial judge is broader in scope and responsibility. In non-jury trials, the judge acts as both fact finder and law applier.
Another significant standard of appellate review is the rebuttable presumption of the regularity of a judgment. This means that the judgment of the lower court, whether pronounced by a judge or a jury, has the presumptive force of correctness until that presumption has been overcome by contradictory evidence. The degree of proof required to rebut this presumption is subject to the standards of appellate review of the manifest error/clearly wrong rule.
The issue in this case, therefore, is whether the record indicates that the trial judge made an independent review of the facts before adopting the jury's responses. Applying the presumption of regularity of the judgment, the inquiry is whether the verdict and or judgment rests on a substantial evidentiary basis. The burden rests on the appellant to assert reasons to show how the jury verdict was manifestly erroneous and why the verdict should not stand. Louisiana makes no distinction between the weight to be accorded to a jury's findings of fact, as opposed to a judge's findings of fact. In other words, the weight and presumption of regularity of the judgment and verdict are entitled to equal weight in either type of case involving finding of facts. Factual findings, in both types of cases, are given vast deference on appeal and are not set aside unless clearly or manifestly erroneous. The reason for this policy is the belief that the fact finder, whether judge or jury, had access to all of the conflicting evidence, and was in the better position than an appellate court to adjudicate the contested facts in dispute.
*423 We note that nothing in the law or the jurisprudence inhibits a judge from adopting a jury's decision in a bifurcated trial, so long as he has independently considered the law and evidence first. Procedurally, the better trial procedure in bifurcated trials, in order to avoid this issue, would be for the trial judge to either prepare a judgment while the jury is deliberating and render the judgment contemporaneously with the jury verdict or render reasons for judgment as to the public defendants at the appropriate time. If the jury verdict and the judge's decision are consistent, the standard of appellate review is manifest error/clearly wrong. If the judgment and verdict are inconsistent, then the standard of appellate review is de novo.
In this case, our reading of the record reveals no compelling evidence that the trial judge simply adopted the jury findings, even though he had strong feelings that those findings were incorrect. The portions of the record cited by Delgado/State as evidence that the trial judge felt that some liability should be assigned to Ford do not convince us that the trial judge abdicated his responsibility to decide the case against the State. As in other types of cases, the trial judge in a bifurcated trial has great discretion to determine percentages of liability. Because of the presumption of regularity, the trial judge's actions in adopting the jury's percentage of liability in this case can only be interpreted to indicate that the trial judge agreed with the jury findings. Thus, we find no merit in Delgado/State's arguments on this issue.

C. Goodyear's liability

Prior to the effective date of the Louisiana Products Liability Act, in order for a plaintiff to recover from the manufacturer of a product under the principles of strict tort products liability, the plaintiff must prove three things: (1) that the harm complained of, i.e. the plaintiff's injuries, resulted from the condition of the product; (2) that the condition of the product made the product unreasonably dangerous for normal use, and (3) that the condition existed at the time the product left the manufacturer's control. Halphen v. Johns-Manville Sales Corp., 484 So.2d 110, 113 (La.1986); Bell v. Jet Wheel Blast, 462 So.2d 166, 168 (La.1985); Traut v. Uniroyal, Inc., 555 So.2d 655, 656 (La.App. 4th Cir.1989).[1]Halphen defines the different types of defective products as follows: (1) unreasonably dangerous per se; (2) unreasonably dangerous in construction or composition, (3) unreasonably dangerous due to lack of an adequate warning, and (4) unreasonably dangerous because of a defective design. 484 So.2d at 113-15.
The primary products liability claim made by the plaintiffs against Goodyear falls within the second category of products liability listed abovethat is, that the tire was unreasonably dangerous in construction or composition. Thus, the plaintiffs were required to prove that the Goodyear tire contained a manufacturing or construction defect which resulted in some unreasonably dangerous condition which was present in the tire at the time it left the manufacturer and which caused the accident in question, resulting in the plaintiffs' injuries.

1. Goodyear's arguments for reversal

Goodyear claims that the plaintiffs failed to meet their burden of proving the second necessary element in a products liability casethat is, that the condition of the tire made the tire unreasonably dangerous for normal use. Thus, Goodyear appeals the portion of the trial court judgment that assigned it 60 percent of the liability for causing the accident. Goodyear raises the following sub-issues on this issue:
a. The trial court committed reversible error in qualifying Dr. Ehrlich as an expert in tire failure analysis and in permitting him to testify regarding the cause of the blowout.
b. Improper jury argument by plaintiffs' counsel, combined with the trial court's overly broad product defect jury charges and jury interrogatories, impermissibly *424 prejudiced the jury by encouraging it to find Goodyear liable for "tire defects" not supported by the evidence.
c. The trial court erred in failing to grant Goodyear's motions for directed verdict and post-judgment motions.
The plaintiffs defend the trial court judgment assigning 60 percent of the liability for the accident to Goodyear, citing general principles of appellate review favoring the conclusions reached by the finder of fact in trials involving conflicting expert testimony. Additionally, the plaintiffs claim that the trial court judgment against Goodyear is supported by several alternative theories of liability.

a. Dr. Ehrlich's testimony

At trial, the plaintiffs offered the expert testimony of Dr. I. Robert Ehrlich, who the court qualified as, among other things, a "tire failure analyst." Dr. Ehrlich testified that he examined the tire, then sent it to Thomas P. Baker for further examination. Baker, he said, examined the tire through a microscope and discovered a "glass-like black object imbedded inside the tire," which Baker photographed with the microscope. Baker said that the object appeared to be 50,000ths of an inch across. This object, Dr. Ehrlich opined, was a manufacturing defect in the tire, which caused the accident in question. Dr. Ehrlich testified to his opinion that the object had penetrated the innerliner of the tire, allowing air to migrate into the tire and get in between the cords, which caused them to separate, resulting in the blowout.
Goodyear argues that Dr. Ehrlich's testimony was the only evidence presented at trial to support the plaintiffs' theory that the accident in question was caused, at least partially, by a manufacturing defect in the tire itself. Goodyear claims that that testimony was improperly admitted for four reasons: (1) the court improperly qualified Dr. Ehrlich, who Goodyear claims is an accident reconstructionist, as a "tire failure analyst"; (2) the court improperly allowed the specific testimony outlined above because it was not based on the proper foundation or proper methodology; and (3) the court improperly allowed plaintiffs' counsel to "bolster" Dr. Ehrlich's testimony with Baker's photographs and findings.

1) Dr. Ehrlich's qualifications

La.C.E. art. 702, which governs testimony by expert witnesses, provides as follows:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
Generally, determination of whether to qualify a witness as an expert under this article is within the sound discretion of the trial judge. Breeden v. Valencia, Inc., 557 So.2d 302, 304 (La.App. 4th Cir.), writ denied 558 So.2d 607 (La.1990). Trial judges are thus afforded "great latitude" in deciding whether a proffered expert has the competence, background and experience to testify as an expert. Pearce v. Power & Telephone, 533 So.2d 46, 53 (La.App. 3d Cir.1988). Although such discretion is not absolute, the decision to qualify an expert witness may not be reversed in the absence of clear error. Breeden, 557 So.2d at 304.
Dr. Ehrlich testified as to his qualifications as follows: Concerning his educational background, he holds a Bachelor of Science degree from the United States Military Academy at West Point, a Masters' degree in engineering from Purdue University, and a Ph.D. in mechanical engineering from the University of Michigan. He served on the faculty of Stevens Institute in Hoboken, New Jersey, where he was head of the mechanical engineering department, vice-president of research, and vice-president for academic affairs. Concerning his experience in engineering safety, Dr. Ehrlich has performed automotive vehicular research for both public and private concerns. Additionally, he helped to design the standard center barrier used on interstate highways throughout the United States and served as a consultant in NASA's design of the lunar roving vehicle. Dr. Ehrlich has also represented a number of major automobile manufacturers, including *425 Chrysler Corporation, Renault, General Motors, Volvo, and International Harvester, as a consultant. Moreover, he has been retained by several tire companies, including Michelin, Uniroyal, Bridgestone, and Armstrong.
The trial court qualified Dr. Ehrlich as an expert in the following areas: mechanical engineering and design, biomechanics engineering, accident reconstruction, tire failure analysis, and highway design research.
Goodyear challenges the trial court's decision to qualify Dr. Ehrlich as an expert in tire failure analysis. It claims that the following excerpt from Dr. Ehrlich's own testimony proves that he is not qualified to testify in that field:
A. I'm not a tire chemist. I don't know the chemistry of tires. I do know the mechanics of failure. I know the tire, how it relates to the car, how it relates to the highway, how it develops traction, how it develops control for steering and handling of the car and I am competent to look at the tire in that respect. If it becomes something in chemistry, a tire bondage or other factors like that, I go to someone who is more knowledgeable in that area than I do [sic].
Trial transcript, Vol. 7 at page 141. Later in his testimony, on cross-examination, Dr. Ehrlich responded as follows:
Q. As I understand your testimony to the jury is that you feel people other than yourself are more qualified to make determinations as to tire failure analysis.
A. Certain areas of tire failure, that is correct, regarding the chemistry and bonding of the rubber to the fabric and things like that.
Q. And your expertise is in the area of tire interfacing with a highway, tire dynamics, is that sort
A. I'm very knowledgeable on tires but I'm not knowledgeable on the chemistry.
Q. Chemistry means how the tires are put together, how the plies are fashioned, the actual manufacturing of a tire?
A. I'm certainly knowledgeable of it but I defer to chemists. I don't try to be an expert in everything.

Trial transcript, Vol. 7 at page 143.
Nothing in the testimony cited by Goodyear proves that the trial judge was clearly wrong in qualifying Dr. Ehrlich as an expert in tire failure analysis. Although Dr. Ehrlich admitted that he was not an expert in "tire chemistry," he also indicated that he was an expert in the area of mechanical tire failure, as it relates to the relationship between the tire and the road. Goodyear argues, but fails to present any authority to prove, that knowledge of tire chemistry is necessary for qualification as a tire failure analyst. Although Dr. Ehrlich's admission that he is not an expert in tire chemistry should be considered in determining the admissibility of certain types of testimony, as discussed below, that admission may not be considered to disqualify Ehrlich as an expert in tire failure analysis.
Goodyear's second argument on this sub-issue is that Ehrlich's action in hiring Baker to evaluate the tire proves that Ehrlich himself was not a tire failure analyst. However, Dr. Ehrlich's testimony on this point indicates that the main reason he sent the tire to Baker for analysis was the fact that he did not have the necessary equipment to examine the inside of the tire, not because he lacked all qualifications as a tire failure analyst. Thus, we find no merit in this argument.
Finally, Goodyear argues that the testimony of Baker and of Thomas M. Dodson proves that Dr. Ehrlich was not qualified to offer expert testimony on tire failure analysis. Baker stated that he had worked with Dr. Ehrlich on a number of cases and that Dr. Ehrlich had always acted as an accident reconstructionist, while he, Baker, acted as the "tire engineer"; usually they were hired by the same client. Dodson also indicated that Dr. Ehrlich had previously hired him to perform tire failure analysis work. However, like Goodyear's arguments discussed above, this testimony does not make the trial judge's decision to qualify Dr. Ehrlich as an expert in tire failure analysis clearly wrong. *426 The fact that, within the knowledge of two other experts, Dr. Ehrlich has previously been qualified only as an accident reconstructionist does not prove conclusively that Dr. Ehrlich has no expertise in tire failure analysis.
In summary, the record contains no compelling evidence that the trial judge abused his sound discretion in qualifying Dr. Ehrlich as an expert in tire failure analysis. We find no merit in any of Goodyear's arguments on this sub-issue.

2) Admission of testimony on the glass object

Next, Goodyear claims that the trial judge committed manifest error in allowing Dr. Ehrlich to testify that the "glass-like black object imbedded inside the tire" was the cause of the blowout. Specifically, Goodyear claims that Dr. Ehrlich's testimony on this issue was not based on the required factual foundation and that Dr. Ehrlich used an improper methodology in reaching his conclusion.
Because La.C.E. art. 702 is identical to Federal Rules of Evidence 702, the Louisiana jurisprudence on admissibility of expert testimony generally follows the federal interpretations. Therefore, Louisiana, like the federal courts, has started questioning whether experts are properly being utilized in cases, especially in cases where the expert's opinion is not supported by peer review or publication. A major reason for the increased scrutiny given expert testimony is the fact that the use of experts has become so frequent. In fact, it has become almost common knowledge that many experts were available to the highest bidder; in other words, they will testify favorably to whomever pays for their services. Thus, a study of both the Louisiana jurisprudence and the federal jurisprudence reveals a concerted effort to find a method for controlling expert testimony. See In re Air Crash Disaster at New Orleans, 795 F.2d 1230 (5th Cir.1986).
Accordingly, the United States Supreme Court recently established a new standard for the admission of expert testimony in Daubert v. Merrell Dow Pharmaceuticals, ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993); that standard was adopted by the Louisiana Supreme Court in State v. Foret, 628 So.2d 1116 (La.1993).[2] In the Daubert case, the supreme court held that Federal Rules of Evidence 702, rather than the "general acceptance" standard established by Frye v. United States, 293 F. 1013 (D.C.Cir. 1923), controls the admissibility of expert scientific evidence in federal court. That rule allows the admission of expert testimony whenever "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue."
The Daubert decision requires trial judges to consider factors other than whether the purported expert's testimony is based on methodology subject to "general acceptance" in the scientific community, allowing the admission of some testimony even if the methodology is not "generally accepted." However, the Daubert case also requires that the trial judge insure that any and all scientific testimony or evidence is not only relevant, but reliable, as a general standard.
To qualify as scientific evidence, an inference, assertion, or opinion must be derived by scientific method. Under Daubert, the federal trial judge is required to apply a two-step analysis, which now applies to La.C.E. art. 702. First, the trial judge must determine in a preliminary hearing whether the expert is proposing to testify to actual scientific knowledge. Second, the trial judge must determine whether such knowledge will assist the trier of fact in understanding or determining a fact in issue.
This preliminary assessment, preferably conducted outside the jury's presence, should include consideration of the expert's *427 reasoning or methodology underlying the testimony. The court should consider both the validity of the reasoning or methodology and whether that reasoning or methodology properly can be applied to the facts at issue. The trial judge should then render an oral or written opinion of its findings on these issues. It may consider, as the United States Supreme Court did in Daubert, the following factors in determining the admissibility of expert testimony:
1. The "testability" of the expert's theory or technique,
2. Whether the theory or technique has been subjected to peer review and publication,
3. The known or potential rate of error, and
4. Whether the methodology is generally accepted in the scientific community.
The proponent of the evidence must demonstrate to the satisfaction of the court that the proposition offered is based on sound scientific procedures and acceptability of the methodology validating the proposition in question. This standard for evidence requires the proponent of the expert testimony to lay a more extensive foundation than was previously required under the Frye rule. The proponent can no longer simply elicit the expert's conclusionary testimony, but must elaborate to some extent about the scientific methodology employed to verify the hypothesisi.e. the tests conducted, the standards employed, and the error rate found.
In adopting the Daubert standards, the Louisiana Supreme Court in Foret emphasized its desire to impose a "requirement that expert scientific testimony must rise to a threshold level of reliability in order to be admissible under La.C.E. art. 702." Foret, at 1123. The Foret case also expressly adopted the Daubert court's "observations," noting that they would "help to determine this threshold level of reliability." Id.
The record in this case indicates that Dr. Ehrlich's testimony that the accident in question was caused by the "glass-like black object," which he identified as a manufacturing defect, does not meet the Daubert/Foret test for admissibility. First, his theory that the object entered the tire during the manufacturing process is not testable and has not been subjected to peer review or publication. The record contains no indication of a known or potential rate of error for the theory. Furthermore, the "methodology" used by Dr. Ehrlich to reach his conclusion is suspect since Dr. Ehrlich relied wholly on the photographs taken by Baker; Dr. Ehrlich admitted that he never actually saw the object personally.
Since Dr. Ehrlich's testimony concerning the alleged manufacturing defect in the tire does not meet the relevant test for admission of expert testimony, we find merit in Goodyear's second argument on this issuethat the trial judge erred in allowing Dr. Ehrlich to testify concerning the alleged defect.

3) Allowing counsel to "bolster" testimony

Goodyear's third argument on this issue is that the trial court improperly allowed plaintiffs' counsel to "bolster" Dr. Ehrlich's testimony with Baker's photographs and findings. Although extensive discussion of this issue is unnecessary in light of our finding that Dr. Ehrlich's testimony on the alleged manufacturing defect was improperly admitted, we do note that neither the Code of Evidence nor the jurisprudence limit an expert's ability to use the findings of other experts in reaching his conclusions. In fact, La.C.E. art. 703, relative to bases of opinion testimony by experts, provides as follows:
The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
Thus, we find no merit in this argument.

4) Effect of conclusions on admission of Dr. Ehrlich's testimony

Generally, when a trial judge has committed evidentiary errors concerning the improper admission of expert testimony outside the expert's field of expertise, the appellate court must determine whether the error *428 affected the result of the casei.e. whether the error was harmless or prejudicial. See Arceneaux v. Koch, 567 So.2d 786 (La.App. 3d Cir.1990); Bunge Corp. v. Emmons, 320 So.2d 230 (La.App. 3d Cir.1975). As the above discussion indicates, the admission of Dr. Ehrlich's testimony concerning the foreign object was prejudicial to Goodyear in this case since that testimony was the only evidence of a manufacturing defect presented at trial, and thus was the only evidence on which the jury could have based its finding that Goodyear was 60 percent liable for the accident.
Whenever an appellate court that has a complete record before it reverses a trial court decision because the jury verdict is erroneous, the appellate court is required to decide the case on the merits de novo. See Gonzales v. Xerox, Corp., 320 So.2d 163 (La.1975). Additionally, whenever, as here, the question before the appellate court is one of the sufficiency and preponderance of the evidence, the manifest error rule does not apply. Hall v. Great Atlantic & Pacific Tea Co., 297 So.2d 527, 530 (La.App. 4th Cir.), writ denied 300 So.2d 842 (La.1974). Thus, this court must consider the evidence without giving any deference to the decision of the trial court.[3]

b. Improper argument, coupled with improper jury charges and interrogatories

Goodyear's second major argument on the issue of whether the trial court properly found it 60 percent liable for the plaintiffs' injuries is that improper closing argument by plaintiffs' counsel, coupled with the trial judge's overly broad product defect jury charges and jury interrogatories, improperly prejudiced the jury to find Goodyear liable, despite a lack of evidence of any defects in the tire in question. This issue revolves around the plaintiffs' alternate contention that the tire contained not only a "manufacturing defect," caused by the foreign object, but a "design defect" because it was unable to withstand the ordinary risks encountered in everyday driving conditions. Goodyear claims that the plaintiffs' arguments on this issue are not supported by any record evidence, but that the jury was encouraged to find Goodyear liable on the basis of a "design defect" through the combination of the following improper circumstances which occurred at trial.

1) Plaintiffs' closing argument

First, Goodyear complains about the following excerpt from the closing argument presented by plaintiffs' counsel:
I asked Charles Gold when he was on the stand, "Tell me what you think this tire hit." He said, "Well, it could have been a rock. It could be [sic] have been a pothole." I asked him, "How deep a pothole?" He said, "Oh, maybe three inches." And the question I have is whether those are the types of things we should expect a tire to encounter and survive in normal operation. And if Goodyear is correct in explaining why this tire failed, then the question I have is why didn't we have a tire safe enough to survive that type of
Trial transcript, Vol. 14, pages 25-26. The record reflects that Goodyear's objection to this argument was overruled by the trial judge.
Goodyear claims that the plaintiffs' argument that the fact of the blowout somehow proves that the tire was defectively designed was improperly allowed because that argument was not substantiated by any evidence presented at trial. The jurisprudence requires that closing argument must be limited to "the evidence admitted and the inferences that may be properly drawn from it." Ogletree v. Willis-Knighton Memorial Hospital, 530 So.2d 1175, 1181 (La.App. 2d Cir.), writ denied 532 So.2d 133 (La.1988). Goodyear claims that the argument quoted above violated that requirement.
*429 We agree. Although Gold, Dodson, and Smith all testified to their opinions that the cause of the blowout was the tire's striking some object at some time prior to the accident itself, none of those experts testified that the tire was defectively designed. In fact, none of the expert witnesses who testified at trial indicated that the tire might have been defective because it was unable to withstand the normal risks associated with everyday driving experiences. Furthermore, no evidence was presented concerning the type of object the tire might have struck. Nevertheless, the trial judge allowed plaintiff's counsel to encourage the jury to consider that possible theory of strict products liability, in the face of a lack of evidence of any such defect.

2) Judge's instructions to the jury

Second, Goodyear claims that the trial judge improperly gave credence to the "design defect" theory of liability by giving the following jury instruction, over its objection:
However, neither custom nor usage in manufacturing style, nor prolonged marketing and use without significant injury producing accidents, can exonerate the manufacturer from liability for reasonably foreseeable injury resulting from normal use. Simply meeting industry standards is not sufficient to rebut the inference that there is a vice or defect in a product. A product defect may be inferred from the circumstances of the accident. Evidence of prior similar accidents may prove the defendant's knowledge of the danger of his product, his ability to correct any defects, or his omission of safety precautions.
. . . . .
If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing, for the manufacturer is presumed to know the vices in the things that the manufacturer makes, whether or not he or she has actual knowledge of the vice in that product.
Trial transcript, Vol. 15, pages 15-17. (Emphasis added.)[4]
The above jury instruction on manufacturer liability improperly focuses more on defective design than on defective manufacture or construction, despite the fact that the plaintiffs' primary theory centered around the alleged defective construction of the tire in question. Moreover, as stated above, the record in this case contains no credible evidence to support the plaintiffs' alternate theory that the tire was defectively designed. Thus, the jury instruction was improper.
Further, the emphasized portions of the trial court's instructions to the jury on products liability were incorrect because the instructions allowed the jury to infer the existence of a vice or defect in a product from the circumstances of an accident, an inference that is not allowed under either the general products liability law or the specific law concerning tire failure. Under the general products liability principles discussed above, the plaintiff is required to prove both that an unreasonably dangerous condition was present in the product at the time the product left the manufacturer and that that condition caused the accident in question. Halphen, 484 So.2d at 113; Bell, 462 So.2d at 168.
Moreover, concerning the specific area of tire failure, the jurisprudence in this state consistently holds that "[f]ailure of a tire is not such an unusual event that a defect can be inferred solely from the fact that the accident occurred." Broussard v. *430 Pennsylvania Millers Mutual Insurance Co., 406 So.2d 574 (La.1981); Traut, 555 So.2d at 656. This conclusion is based upon a longstanding principle of law, as demonstrated by the following quote from Williams v. U.S. Royal Tires, 101 So.2d 488, 492 (La. App. 1st Cir.1958): "It cannot possibly be presumed or said that the blowing out of this tire was solely because of a defect therein by the alleged manufacturer.... There are numberless means or causes other than a defect in the manufacture, which bring about a blow out of a tire."[5]
A trial judge has a duty to give instructions which properly reflect the law applicable in light of the facts of a particular case. Barnett v. New Orleans Public Service, Inc., 489 So.2d 452, 455 (La.App. 4th Cir.1986). In order to fulfill that duty, he must both require that the jury consider only the correct law, Id., and avoid confusing the jury. Cuccia v. Cabrejo, 429 So.2d 232, 235 (La.App. 5th Cir.), writ denied 434 So.2d 1097 (La.1983).
The instructions given by the trial judge in this case did not meet the standards required by the above cases. The instructions allowed the jury to infer a defect in the tire from the fact that the blowout occurred, an inference specifically prohibited by the applicable jurisprudence. Thus, the trial judge failed to meet his responsibility to give instructions which properly reflect the applicable law.[6]

3) Jury interrogatories

Finally, Goodyear claims that the errors discussed above were further exacerbated by the inclusion, over its objection, of the following jury interrogatories:
1. Do you find that it is more likely than not that the tire manufactured by Goodyear Tire and Rubber Co. was defective?
 Yes___ No___
2. Do you find that the defect in the manufacture of the tire was a legal cause of the accident and injuries?
 Yes___ No___
Specifically, Goodyear claims that the above interrogatories were improper, especially in light of the trial judge's general instructions on the issue, because they failed to limit the jury's consideration of Goodyear's liability to the question of whether the "glass-like black object" constituted a defect. Goodyear claims that this error was compounded by the fact that the jury interrogatory relative to Ford's alleged product liability was limited; that interrogatory asked as follows:

*431 3. Do you find that it is more likely than not that the van manufactured by Ford Motor Co. was defective because of its handling characteristics?
 Yes___ No___
We find merit in Goodyear's argument on this issue, not only for the reasons argued by Goodyear, but also because of the fact that the second jury interrogatory relative to Goodyear, which asked whether the alleged manufacturing defect was a "legal cause" of the accident which caused the plaintiffs' injuries, was misleading and confusing. Although legal causation is a question for the trier of fact, Wilson v. State, Dept of Public Safety, 576 So.2d 490 (La.1991), the context of the interrogatory in the instant case indicates that the trial judge was seeking a decision on whether a manufacturing defect in the tire was a cause-in-fact of the accident, not a legal cause.
Moreover, the instructions to the jury given by the trial court in this case do not define legal causation. Generally, causation in a products liability case is not legal causation. Furthermore, the definition of legal cause is too broad and too vague to be left to the jury, especially when the jury instructions have not properly defined that concept.
In this case, the interrogatory referred to "legal cause," when the real question to be answered was whether the glass object was a cause-in-fact of the accident. The jurors were not told that they could not find Goodyear liable unless they determined it was more probable than not that the accident would not have occurred but for the presence of the glass object in the tire. Theriot v. Lasseigne, 624 So.2d 1267, No. 92-903 (La. App. 3d Cir.1993). The jury interrogatory actually used contained an amorphous concept which could not have been understood by the average juror.

4) Combination of the factors

We find that Goodyear's argument that the jury was encouraged, through the combination of the above circumstances allowed at trial, to find Goodyear liable for defects in the tire, not supported by the record, has merit. First, plaintiff's counsel was allowed to make statements during his closing argument which introduced an entirely new theory of strict products liability and which indicated that the jury could properly presume that the tire was defectively manufactured simply because it suffered a blowout. Second, the trial judge specifically told the jury that it could infer the existence of a defect from the circumstances of the accident. Third, the judge refused to limit the interrogatories concerning Goodyear's liability, despite the fact that the interrogatory relative to Ford's liability for a defect in its product was limited. Finally, the second jury interrogatory was misleading and confusing because it improperly referred to legal causation.
Moreover, the combination of the above factors is sufficient to constitute reversible error. The inclusion of confusing, unclear, and/or misleading jury instructions may constitute reversible error by itself. See Doyle v. Picadilly Cafeterias, 576 So.2d 1143, 1153 (La.App. 3d Cir.1991). The same rule is true when a trial court submits a jury verdict sheet containing misleading and/or confusing interrogatories. See Marks v. Louisiana Farm Bureau Casualty Insurance Co., 556 So.2d 949, 952 (La.App. 3d Cir.1990). Additionally, the combination of improper jury instructions and improper jury interrogatories can form the grounds for reversal. See Jordan v. Palm Apartments, 353 So.2d 1120 (La.App. 4th Cir.1977). Certainly a trial court judgment may be reversed when those two errors are further compounded by improper closing argument, as in this case. Thus, the trial court judgment holding Goodyear 60 percent liable for the accident must be reversed for this reason, as well as for the reasons discussed above.
As noted previously, when the record is complete, an appellate court which has reversed a trial court judgment because the jury verdict is erroneous must perform a de novo review of the evidence, without giving any consideration to the trial court judgment; the manifest error standard does not apply. Gonzales, 320 So.2d 163; Hall, 297 So.2d 527.

c. Failure to grant motion for directed verdict and post-judgment motions

Goodyear's third argument that the judgment finding it 60 percent liable for the *432 plaintiffs' injuries must be reversed is that the trial judge improperly denied its motion for directed verdict and its post-judgment motions for judgment notwithstanding the verdict and, alternatively, for new trial. However, since we find merit in both of Goodyear's initial arguments on this issue, we pretermit discussion of whether the trial judge should have granted Goodyear's motions.

2. De novo review

As noted, because the trial judge improperly allowed Dr. Ehrlich to testify concerning matters outside his area of expertise, and because the trial judge committed the combination of errors discussed above which improperly allowed the jury to infer a manufacturing defect in the tire from the fact that the blowout occurred, the judgment against Goodyear must be reversed and this court must review the evidence presented at trial de novo to determine whether the plaintiffs carried their burden of proving that the tire manufactured by Goodyear was defective.
A review of the evidence in the record in this case reveals three different theories for the failure of the tire in the instant case: (1) the presence of the foreign object, (2) the tire's striking some object at some point prior to the blowout, and (3) underinflation and improper maintenance of the tire.
We have already discussed the first two theories. As noted, the foreign object theory was presented only in Dr. Ehrlich's improperly-admitted testimony. Since we have found that that testimony was not reliable because Dr. Ehrlich was not qualified to testify concerning the manufacture of the tire, and since Dr. Ehrlich's testimony is the only evidence in the record that the foreign object constituted a manufacturing defect, the record contains no reliable evidence on this issue. Thus, we find that the plaintiffs failed to prove a manufacturing defect caused by the presence of the foreign object.
Likewise, the evidence on the impact theory is insufficient to prove a manufacturing defect. As stated above, three of the experts who testified at trialGold, Smith, and Dodson stated their opinions that the blowout was caused by the tire striking some object, which weakened the tire and made it susceptible to a blowout, at some point prior to the accident. However, two of those experts also stated unequivocally that they had found no manufacturing defect in the tire. Moreover, no evidence, by expert testimony or otherwise, was presented indicating that the occurrence of a blowout after the tire struck some object was proof that the tire was defectively manufactured. Furthermore, the plaintiffs failed to present any concrete evidence concerning what type of object the tire might have struck. The law on the issue consistently holds that the fact that a blowout occurred may not be considered evidence of a manufacturing defect. Thus, the evidence in the record on the impact theory is insufficient to carry the plaintiffs' burden of proof.
The final theory of the cause of the blowoutunderinflation and improper maintenance of the tireis completely unrelated to any fault on the part of Goodyear and will be discussed later in this opinion in the section concerning Delgado/State's liability. Thus, we find that the plaintiffs failed to carry their burden of proving that Goodyear was partially liable for the accident in question because of a manufacturing defect in the tire.
The plaintiffs argue that the record supports a finding of liability on the part of Goodyear on "several alternative bases," noting that defects in products may be proved by circumstantial evidence. The plaintiffs cite the different types of defective products, as defined by Halphen, 484 So.2d at 113-15, as follows: (1) unreasonably dangerous per se; (2) unreasonably dangerous in construction or composition, (3) unreasonably dangerous due to lack of an adequate warning, and (4) unreasonably dangerous because of a defective design. The plaintiffs claim that the record proves that the tire in question was defective for any and all of the reasons listed in Halphen, claiming that Goodyear's arguments are designed to improperly confine their evidence to a "single-theory" case.
However, the plaintiffs' interpretation of the evidence in the record is fatally flawed. Although the plaintiffs correctly cite La. *433 C.C.P. art. 2164, which gives an appellate court power to "render any judgment which is just, legal and proper upon the record on appeal," they fail to recognize the fact that the record on appeal in this case simply does not support any theory of liability against Goodyear. The plaintiffs correctly argue that neither the trial court nor this court is limited by the now-defunct "theory of the case" doctrine to the foreign object theory in finding liability on the part of Goodyear. However, the record in this case simply contains insufficient evidence to prove a manufacturing defect either on that theory or on any other theory of liability.
This conclusion is supported by the fact that, despite their contention that Goodyear's liability is supported by "several alternate bases," all of the arguments presented in the plaintiffs' brief on this issue refer directly to the foreign object theory, which we have already rejected. The only evidence to indicate that the Goodyear tire in question was defective contained in the entire voluminous record in this case is Dr. Ehrlich's testimony and opinions concerning the foreign object, about which he was not qualified to render an opinion.
Since our de novo review reveals that the evidence in the record is insufficient to carry the plaintiffs' burden of proving that the blowout of the Goodyear tire was caused by a manufacturing defect, we render judgment in favor of Goodyear and against the plaintiffs.

D. Delgado/State's liability

On appeal, Delgado/State challenges the trial court judgment, saying the plaintiffs failed in their burden of proving any negligence on the part of Delgado/State which caused the accident. Delgado/State initially attacks the factual conclusion of the trial court, claiming that only two theories of liability were advanced at trial(1) improper maintenance of the tire and (2) improper driving of the vehicleand that the record does not support either theory. Additionally, Delgado/State makes a legal argument on the second theory, saying that the trial court should have applied the sudden emergency doctrine. Goodyear notes two additional theories for Delgado/State's liabilitynegligence in selecting or allowing Brent Griffin, a student coach, to drive the van and/or failing to properly train the driver.
The plaintiffs' case against Delgado/State is based purely on negligence. In order to recover from a defendant in negligence, the plaintiff must prove the following elements: (1) that the conduct of which the plaintiff complains was a cause in fact of the harm; (2) that the defendant had a duty to protect against the risk involved; (3) that the defendant breached that duty; and (4) damages. Blair v. Tynes, 621 So.2d 591, 595 (La.1993). Delgado/State's challenge to the trial court judgment in this case focuses on a combination of the first and third inquiries of this testthat is, whether the plaintiff proved that Delgado/State breached any duty to the plaintiffs and whether that breach caused the accident in question.
Delgado does not address the question of whether it owed any duties to the plaintiffs, who were students at the college and members of the college's baseball team; therefore, we can assume that Delgado/State would admit that it owed certain duties to the plaintiffs. We find specifically that Delgado/State had duties to the plaintiffs to do the following things: (1) properly maintain the vehicle, (2) select a qualified driver for the vehicle, and (3) properly train the driver. Additionally, Delgado/State had a vicarious duty, performed through the driver, to properly operate the vehicle. We will discuss the evidence that those duties were breached and that the breach of those duties caused the accident below.
We note also that Delgado/State does not address the question of whether the plaintiffs suffered damages, apparently conceding damages, although Delgado/State does contest the extent of those damages, as discussed in the "DAMAGES" portion of this opinion.
In considering whether Delgado/State breached its duties to the plaintiffs and whether those breaches caused the accident, which are both factual questions, this court is bound by the manifest error standard of reviewi.e., the judgment may not be reversed by this court unless we find that the *434 decision was manifestly erroneous. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Further, when "a factfinder's finding is based on its decision to credit the testimony of one of two or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong." Id. at 845. Thus, we will review the evidence of negligence on the part of Delgado/State with those principles in mind.

1. Improper maintenance

First, Delgado/State claims that the trial court record contains insufficient evidence to support a finding that the tires on the van in question were improperly maintained or that improper maintenance caused the accident in question.
The most direct evidence concerning the maintenance of the van and the tire was the testimony of Lee Harris Venison, the Delgado mechanic who was responsible for preventive maintenance on all the school's vehicles, including the van. Venison said that it was his duty to maintain the air pressure in the tires of the van, but that he was never instructed about how to service the van or about the proper air pressure for the tires; nor had he ever seen the owner's manual for the van. He stated that he maintained the pressure in the van's tires at 45 p.s.i., as was his custom and practice, and that he saw no damage to the tire when he serviced it. He admitted that he was not sure that he had serviced the van in question on the day of the accident and that he had no personal knowledge of the tire pressure in the van at that time.
Tommy Lee Smith, the athletic director at Delgado, stated that it was not his job to check the tires on the van, that the maintenance department was charged with the duty of checking out the vehicles after each trip. He stated that he assumed that the maintenance department had performed a checkup prior to the trip when the accident occurred. Additionally, Smith claimed that he "looked at the van, not specifically at the tires" prior to the trip, but that he did not notice anything wrong with the tires. If something unusual about the tires had existed, Smith asserted, he would have noticed.
Expert witness Andrew W. McPhate stated that the other Delgado van which he drove while investigating this accident had a p.s.i. of 51 when he took it out for a test, and admitted that driving the van with the tires at that pressure, which was below the recommended 75 p.s.i., could cause tire failure if it occurred over a long period of time. He also stated that driving a tire at 45 p.s.i. during the summertime could result in a great risk of overheating. However, McPhate stated that the fact that the middle of the tire appeared to be worn down more than the shoulders was positive proof that the tire was not run underinflated for most of its life.
Expert witness Dodson stated that his examination indicated that the tire had been properly inflated most of its life. However, Dodson opined, the tire was run underinflated for a short period of time after it impacted with some foreign object, which resulted in the blowout. Dodson thought that the tire had been run overinflated most of its life, but that it was underinflated probably about 20 to 30 percent at the time of the blowout, and probably for at least 100 miles prior to the accident. Although he believed that the underinflation was a contributing factor to the blowout, Dodson stated that the tire would have failed even without the underinflation. Dodson also felt that 50 p.s.i. was sufficient for the tire that failed. Finally, Dodson said that you cannot tell whether a tire is properly inflated just by looking at the tire; you need to gauge the air pressure.
Expert witness Baker also stated that his examination of the tire tread indicated that it was "relatively well inflated" and that it "had a lot of air in it" for most of its tread life. However, he said, conflicting evidence on the beads of the tire indicated that the tire did not have enough air for the load it was carrying for much of its life. This conflicting evidence, he said, indicated that the loads carried by the van varied from very heavy loads to very light loads.
Expert witness Gold, who felt that the cause of the accident was an impact with some unspecified object sometime before the blowout, stated that he found evidence that the tire had been run underinflated, which causes a tire to run hotter than it otherwise *435 would. About 70 to 75 percent of the use of the tire was gone at the time of the accident, he said; only 20 to 30 percent of the use remained. Insufficient air was a contributory cause of the accident, he said, although the tread wear pattern of the tire suggested that it was not run underinflated for most of its life. Gold asserted his belief that the tire failure would eventually have occurred even without the underinflation, but that it would have occurred at a different location. Gold also testified that the recommended air pressure for the tires on the Ford van, according to the manual, was 40 p.s.i. in the front tires, and 75 p.s.i. in the rear tires. Additionally, Gold noted that the right rear tire which suffered the blowout had not been rotated, but had always been attached to the rear of the vehicle.
Expert witness Russell A. Galorneau, who designed the van for Ford, stated that the proper tire pressure was 40 p.s.i. for the front tires and 75 p.s.i. for the back tires.
Even expert witness Dr. I. Robert Ehrlich, who attributed the cause of the accident to a manufacturing defect in the tire, stated that the sensation of swaying in the van could have been caused by underinflation of the tire and admitted that underinflation could have caused the blowout. Additionally, expert witness John Smith, who ascribed to the impact theory of tire failure, stated that the blowout was aggravated by underinflated operation.
Thus, the record reveals ample evidence to support the trial court's judgment both that Delgado/State breached its duty to properly maintain the vehicle and that that breach caused the accident. The most direct evidence concerning the inflation of the tires indicated that the tires were routinely maintained at 45 p.s.i. rather than the recommended 75 p.s.i. The conclusion that the tire which failed was underinflated for much of its life is further supported by the testimony of several of the experts who examined the tire. Although the record also contains evidence to the contrary, a trial court's decision in the face of conflicting evidence can never be manifestly erroneous. Rosell, 549 So.2d at 845. Additionally, all of the evidence presented at trial is consistent that running a tire underinflated can, by itself, cause a tire blowout. Thus, we find no manifest error in the trial court judgment holding Delgado/State liable for the accident.[7]

2. Selection of driver

Although not specifically addressed in brief by Delgado/State, the plaintiffs attempted at trial to prove that Delgado/State further violated its duties by negligently selecting or allowing Brent Griffin, who was a student coach for the baseball team, to drive the van and that allowing an inexperienced driver to drive the van caused the accident. They claim that Griffin, who possessed only a Class A operator's driver's license, and not a Class C chauffeur's license, was not qualified to drive the van. Further, the plaintiffs claim that Delgado/State made no effort to assure that its own rule that the van be driven only by persons with chauffeur's licenses was followed.
The purpose of the law requiring that the drivers of passenger vans possess Class C chauffeur's licenses is to protect the class of persons operating passenger vans and to protect the public from unqualified drivers. The mechanics of driving such vans are different from the mechanics of driving passenger automobiles; they are operated differently; they handle differently. Therefore, if Delgado/State failed to require that the drivers of the vans possess the proper license, it breached a duty to the public, including the plaintiffs in this case.
Griffin testified that he was designated as a driver by Coach Louis Scheurman and that Patrick Prigmore, another team member, was the co-driver. He stated that he had been driving since he was 16, that he *436 held a Class A driver's license, and that no one told him he needed a chauffeur's license to drive the van. No one at Delgado had ever inquired about whether he had previous experience driving a van prior to the accident, Griffin said. Further, Griffin claimed that he was not given any instructions by Delgado to see that the seat belts were used by the passengers. Griffin admitted that he was unable to control the swaying of the van after the blowout occurred.
Prigmore, who was a passenger in the van on the day of the accident, testified that he split the driving with Griffin and that he had driven the van on trips about 15 or 20 times prior to the accident. He said that he also held a Class A driver's license, but not a chauffeur's license.
Dr. Harry Boyer, president of Delgado College, said that Schuerman, as athletic director and head baseball coach, was charged with the responsibility of determining who would drive the vans and station wagons when the team travelled. He said that he was not aware until the accident occurred that the team was using student drivers, and that he did not consider it appropriate for students to drive the van. Dr. Boyer said that he had told Schuerman that the drivers should be either assistant coaches or specially-hired drivers.
Assistant coach Smith, who said that he made the arrangements for road trips, testified that he was "completely satisfied" that Griffin was a competent driver because he had observed him driving before. However, he admitted that he never checked to see whether Griffin had a chauffeur's license because Griffin was already a regular driver when he arrived at Delgado.
Head coach Schuerman said that he assigned Griffin to be one of the drivers, but he never requested a chauffeur's license. Additionally, Scheurman admitted that he never tried to determine whether Griffin had taken driver's education.
Griffin said that the vans were rarely occupied by adult faculty members when the team made road trips. This testimony was corroborated by the testimony of David Flettrich, who said the vans were not occupied by Delgado staff members, that there was no supervision, and that the vans were not caravaned. Team member Mickey Maitre also stated that none of the coaches ever rode in the vans with the players; instead, they would meet the team at the location of the game.
We find that the trial court was not manifestly erroneous in finding, on the basis of the above evidence, that Delgado/State breached its duty to the plaintiffs by selecting or allowing Griffin to drive the van, both because Griffin was not qualified to drive the van since he did not possess a chauffeur's license and because of the internal rule that students not be allowed to drive the vans.
Further, the trial court was not manifestly erroneous in concluding that Delgado/State's actions in selecting or allowing Griffin to drive the van when he was not qualified to do so on caused the accident, as further discussed below in the section entitled "Griffin's actions." Because Griffin was not qualified to drive the van, he reacted improperly when the blowout occurred. The trial court was thus not manifestly erroneous in finding that the accident would not have occurred had Griffin responded in the correct manner. Thus, the trial court judgment holding Delgado/State liable for the accident in question is not manifestly erroneous.

3. Training of driver

This issue is also not directly addressed by Delgado/State's brief, but is raised by the record evidence. The plaintiffs claim that Delgado/State also breached its duties by failing to train the drivers it selected to operate the van, especially by failing to instruct the drivers on the proper actions to take in the event of the blowout of a tire. Furthermore, the plaintiffs claim that the failure to train the drivers caused the accident. The failure to properly train the drivers, the plaintiffs indicate, is especially negligent in light of the fact that tires on the vans used to transport the team had suffered previous blowouts, which had resulted in difficulties in steering the vehicle.
Griffin stated that no one at Delgado ever gave him any instructions regarding the *437 speed of the vehicle, or regarding safety issues of any kind.
Assistant coach Smith said that he instructed the students who were driving the vehicles to take their time and to keep the vehicles within 60 mph. Otherwise, he admitted that he did not give them any special instructions. Smith said that he had no knowledge of whether anyone at Delgado had ever instructed Griffin concerning the proper procedures to follow in the event of a blowout.
Head coach Scheurman said that he instructed the drivers of the vans about safety and safety belts, although he admitted that he did not remember telling them to wear seat belts. Additionally, he said that he instructed them not to exceed the speed limit, and that they would be responsible for their own tickets if they did.
Several of the witnesses testified to a 1985 blowout on a Ford van owned by Delgado, which was being driven by David Smith at the time. Flettrich said that he was in that van at the time of the blowout, that the driver lost control, and that the van did a 180 degree turn on the interstate, ending up on the shoulder of the road. Flettrich said that no one on the Delgado administrative staff gave instructions on emergency blowouts, even after the 1985 accident. Scheurman also acknowledged the fact that the blowout had occurred.
Thus, we find that the trial judge was not manifestly erroneous in holding Delgado/State liable for the accident since he could reasonably have concluded on the basis of the above evidence that Delgado had failed to properly train Griffin to operate the van and that that failure caused the injuries because of Griffin's improper actions taken after the blowout occurred, as discussed in more detail below.

4. Operation of vehicle[8]
Finally, Delgado/State claims that the record evidence is insufficient to support a factual conclusion either that Griffin negligently responded after the blowout of the tire or that Griffin's response was a cause of the accident. Delgado/State also makes a legal argument on this issue, arguing that the trial judge should have applied the sudden emergency doctrine to relieve the driver, and thus Delgado/State, of any liability for negligent operation of the vehicle after the blowout.

a. Griffin's actions

Griffin said that he was driving between 55 and 60 mph in a 55 mph zone when the accident occurred. He said that he was in the left lane of traffic at that time and that he did not apply the brakes when he heard the loud noise. Griffin admitted, however, that he did apply his brakes before the vehicle left the roadway, claiming that he "hit the brakes slightly as to gain a little control." He also said that he held the steering wheel straight, but that the vehicle went first into the right lane, then suddenly shot off onto the left side of the highway onto the median.
Maitre, a passenger in the van, estimated the speed of the van at the time of the blowout at 65 to 70 mph, but admitted that he could not see the speedometer immediately prior to the accident. He said 65 to 70 was the customary speed driven by Griffin. When the blowout occurred, Griffin immediately jammed on the brakes, Maitre said; he said that he knew this because he was immediately jerked forward after the blowout. Maitre said the van was travelling in the left lane and that after the blowout, the van swayed to the right, then to the left, finally going onto the median, where it did a 180 degree turn, then flipped three times. He also said that Griffin was jerking the wheel of the vehicle back and forth during this time period.
Reynolds, who was also a passenger in the van on the day of the accident, said he was first aware of a problem about 10 minutes prior to the accident, when he noticed that Griffin was driving recklessly. He said that *438 the van was going 70 mph when the blowout occurred.
Another passenger in the van, Alton Sartin, said that Griffin jammed on the brakes "real hard" and yanked the steering wheel back to the left when the blowout occurred. He said that since he was seated directly behind the driver, he had a better view of Griffin's actions than anyone else in the van. However, Sartin also said that Griffin did not take those actions until after the van started swaying. Sartin said that he had been taught never to hit the brakes or turn the wheel when a blowout occurred, but that you should hold the wheel and let the vehicle itself come to a complete stop.
Prigmore, the co-driver of the van, stated that when the blowout occurred, he told Griffin, "Hold it, Hold it. Don't lose it." Prigmore also thought he remembered telling Griffin not to hit the brakes. He said that he did not know whether Griffin hit the brakes, but that he saw Griffin trying to get the steering to go the opposite way just before he lost control.
The expert testimony also indicated that Griffin responded negligently when the blowout occurred. Dr. Ehrlich stated that the fact that the driver was speeding was one of the causes of the accident, especially when coupled with the fact that the driver did not know what to do when the blowout occurred. He said that Griffin jammed on his brakes, when he should not have, which resulted in loss of the rearend stability of the vehicle and caused the vehicle to swing sideways, after which there was no control. Speed, Dr. Ehrlich said, was also a factor which made the rollover more violent.
Expert witness James Schultz also said that he believed that the vehicle was exceeding the speed limit of 55 mph at the time of the accident. However, he said that his investigation revealed no physical evidence of braking on the tires or otherwise.
Relative to the proper procedures to follow in the event of a blowout was the testimony of Elton Lagasse, dean and driver's education teacher at Delgado at the time of the accident. Lagasse testified that when a blowout occurs, the driver should slow down, press the pedal gently, and try to guide the vehicle to the side of the road.
Further, Flettrich stated that he had a conversation with Griffin after the 1985 blowout concerning the correct way to handle the van after a blowout and that he told him, "Don't hit the brakes until after you get a blowout. Drive through it."
Additionally, the record contains evidence that Griffin was aware of the fact that the tire was underinflated on the day of the accident, but that he failed to take actions to remedy the situation. Flettrich, who was in another vehicle on that day, testified that he told Griffin that the tire was low earlier that day; that he could see that the tire was low from 10 to 15 feet away. Further, Reynolds, who was in the van that day, stated that he thought he remembered Griffin telling someone to check the tire before they left. Craig Ledet, a Delgado baseball team member who was not riding in the van at the time of the accident, corroborated this testimony, saying that he noticed that the tire was low the day of the accident and that he was present when Flettrich told Griffin that the tire was low. Griffin testified that he had been told that one of the tires was low before the first trip of the year, and that he had to put air in the tire before he left on that trip; he did not check the tires prior to the trip in question, he said.
Thus, the record evidence is sufficient to support a finding that the trial judge was not manifestly erroneous in finding that Delgado/State breached its vicarious duty, through Griffin's actions, to operate the van in a proper manner under the circumstances. Further, the trial court was not manifestly erroneous in finding that Griffin's improper actions caused the accident. Thus, the trial court was not manifestly erroneous in holding Delgado/State liable for the accident because of the negligent actions of its chosen driver, Griffin.

b. Sudden emergency doctrine

Delgado/State claims, however, that the trial court made a legal error in holding it liable for the accident, if that liability is based on negligent actions on the part of Griffin. Delgado/State claims that the "sudden *439 emergency" doctrine should have been applied to relieve Griffin, and thus Delgado/State, of any liability. That doctrine excuses the negligent actions of a driver when unexpectedly confronted with an emergency, provided the driver did not help to create that emergency. See Hickman v. Southern Pacific Transport Co., 262 La. 102, 262 So.2d 385 (1972); Coleman v. State, through DOTD, 524 So.2d 1281 (La.App. 3d Cir.1988). The Hickman case describes the doctrine as follows:
One who suddenly finds himself in a position of imminent peril, without sufficient time to consider and weigh all the circumstances or best means that may be adopted to avoid an impending danger, is not guilty of negligence if he fails to adopt what subsequently and upon reflection may appear to have been a better method, unless the emergency in which he finds himself is brought about by his own negligence.
262 La. at 112-13, 262 So.2d at 388.
However, it is unnecessary for us to determine whether the suddenly emergency doctrine should have been applied to excuse Griffin's negligence in the instant case. Even assuming that Delgado/State should not be held vicariously liable for Griffin's actions, Delgado/State would still be responsible for its own negligence in failing to properly maintain the tire, in selecting Griffin as the driver of the van, and in failing to properly train Griffin to drive the van. Thus, the application of the sudden emergency doctrine would not change the result in this case.

5. Combination of factors

As indicated above, the trial court's judgment holding Delgado/State liable for the accident in question was not manifestly erroneous on the basis of any of the theories of liability discussed. The evidence was sufficient to prove that Delgado/State breached its duties to the plaintiffs to do the following things: (1) maintain the vehicle, (2) select a qualified driver, and (3) properly train the driver. Furthermore, the evidence is sufficient to prove that Delgado/State breached its duty, performed through Griffin, to operate the vehicle properly under the circumstances.
Not only was the above evidence sufficient to support a trial court finding that Delgado/State breached its duties to the plaintiffs, it was also adequate to prove that the breach of those duties caused the accident in question. The plaintiffs proved a combination of substantial factorsi.e. speed, improper training of the student driver, inexperience of the driver selected, and actions of the driverall of which were shown by a preponderance of lay and expert testimony, as indicated above, to be causes of the accident in question.
Thus, the trial court judgment holding Delgado/State liable for the plaintiffs' injuries caused by the accident is not manifestly erroneous. It is hereby affirmed.

E. Ford's alleged liability

Both Delgado/State and plaintiff Davey Paul Clement challenge the trial court's factual finding that no defect in the Ford vehicle caused the accident and therefore appeal the judgment exonerating Ford Motor Company from liability for the accident. Additionally, Clement makes a legal argument on this issue, claiming that the trial court committed reversible error when it limited the jury interrogatory concerning Ford's alleged liability to a question of whether the van was defective for its handling characteristics, and refused to charge the jury on his theory of products liabilityi.e., that the rear door latch was defective.
Since the basis of the plaintiff's case against Ford was strict products liability, they were required to prove the following elements in order to recover against Ford: (1) that the harm complained of, i.e. the plaintiff's injuries, resulted from a condition of the product; (2) that the condition of the product made the product unreasonably dangerous for normal use, and (3) that the condition existed at the time the product left the manufacturer's control. Halphen, 484 So.2d at 113; Bell, 462 So.2d at 168; Traut, 555 So.2d at 656.

*440 1. Defective because of handling characteristics

Delgado/State claims that the trial court's decision exonerating Ford is manifestly erroneous because the evidence presented at trial was sufficient to prove that the vehicle could not be controlled in the event of a blowout of a rear tire. This evidence, Delgado/State claims, met the plaintiffs' burden of proving the elements of a cause of action in strict products liability against Ford.
Griffin testified that on the five or ten trips that he drove the van prior to the accident, the van would sway from side to side a little, that it was not a major problem, but it was noticeable. Although the van was generally easily controlled, Griffin said, he was unable to control the swaying after the blowout.
Flettrich testified that he was a passenger in the school's other Ford van when it suffered a blowout in 1985. Although the driver lost control on that occasion, the vehicle ended up on the side of the road, where the tire was simply changed, he said. Flettrich testified to the fact that he sometimes had difficulty driving the vans because they had a tendency to sway when on the interstate. Additionally, he noted the fact that the van swayed more and was therefore harder to keep on the road when it contained more people. In fact, Flettrich said, the heavier the van became because of passengers and equipment, the more difficult it was to control. Moreover, he felt that the vans were harder to control at higher speed of travel.
Maitre testified that he noticed the van swaying all the time when he was a passenger. He said that when the van was on the highway, it swayed anytime there was a slight movement of the wheels. However, if the passengers were seated, the van did not sway as much, Maitre stated.
Prigmore, who also sometimes drove the school van, stated that the vehicle had a little "play" in the steering wheel, and that it swayed so much on windy days that it was tough to keep it in a lane. Additionally, the van would sometimes sway while he was trying to switch lanes, he said; the effect of the swaying was most noticeable in the back. He felt that the Ford van swayed more than the Chevy and Dodge vans, but he had never reported that the van swayed excessively.
Expert witness McPhate, who drove the "sister van" to the one involved in the accident during his investigation, stated that he found nothing unusual about the dynamics of that vehicle, that it was easy to steer, but that it did drive differently than a car. He admitted that the van "swings" a little more than a car, but attributed that characteristic to the size of the vehicle. He also felt that the driver was required to "overdrive the steering" because it did not respond right away. Later, however, he admitted that the van would be a "real handful of trouble" in the event of a blowout on the rear end, saying that most drivers would be unable to handle the van in that case if it was significantly loaded. He said that the van was "unsafe for a normal driver" and not safe for its purposes because it had a high center of gravity with the majority of the weight on the rear wheels. Thus, he concluded, the van was defectively designed.
Ford's expert Galorneau, who designed the van in question, stated that good handling of the van depends on proper tire pressure. He said that the driver would have no trouble controlling the vehicle in the event of a blowout, if the tires were properly inflated.
After reviewing the above evidence, we find no manifest error in the trial court judgment exonerating Ford from liability. Although the record contains considerable evidence that the van did sway and that the swaying caused it to be difficult to handle, the record also contains evidence that the swaying could have been attributed either to improper tire pressure or to heavy loads, not to any manufacturing defects. Since the record contains conflicting evidence to explain the swaying of the vehicle, the trial court's decision to credit some evidence over other cannot be found manifestly erroneous.

2. Defective rear door latch

Clement claims that the trial court should have found that the Ford van was defective because the rear door latch was unreasonably dangerous, specifically challenging the trial judge's refusal to charge the *441 jury or give a jury interrogatory on the alleged defective latch. He claims that his injuries were exacerbated by the fact that he was ejected from the van when the rear door came open improperly.
Clement's allegation is supported by Reynolds, who testified that when the van flipped, two passengers were thrown from the back door of the van because the rear door popped open. Additionally, eye witness Mary Fontenelle stated that she believed that every door on the van opened while the van was in the air and that several people were ejected.
Dr. Ehrlich testified to a Ford design problem in the rear door latch, which "contributed to the problem after the accident." He said that if the door came open during the rollover, the design of the latch was defective. The door should have been designed to stay closed during a rollover, Dr. Ehrlich said. However, Dr. Ehrlich admitted that no federal standards required that the rear cargo door remain closed in a rollover. Dr. Ehrlich also presented photographs of what he identified as the broken rear door latch.
Ford claims, on the other hand, that Clement was mistakenthat he was actually ejected through a side window and that the rear door did not open during the rollover. This theory is supported by the testimony of expert witness Vern Roberts, who found, based on body print evidence inside the van that Maitre, Abadie, and Clement were all ejected through left side windows in the van. He said that since the forces on the occupants of the van came from the left and rear, they were forced out the side windows, not through the rear doors. Roberts said that this conclusion is supported by Clement's injuries, which were mostly confined to the left side of his body, as well as other physical evidence. No one was ejected from the back seat, because they had no side window next to them, Roberts said. No one was ejected out the back door, he added.
Ford expert Galorneau said that the rear door latch was not broken, and that the object which Dr. Ehrlich identified as a latch was actually a stabilizer designed to keep the door from rattling. He said that the rear door was equipped with three separate latches, none of which were broken. Each of the latches had both a primary and a secondary latch, as required by federal motor vehicle safety standards, he said.
Once again, the trial court was faced with conflicting evidence on the issue of whether the van's rear door latch was defective, and the factfinder's decision to accept one version over another cannot be manifestly erroneous. Thus, we find no error in the trial court's factual conclusion that Ford was not liable for the accident.
Moreover, we find no manifest error in the trial judge's refusal to give the jury an interrogatory on the allegedly defective door latch. The trial judge, in denying the request for the interrogatory, stated his conclusion that the record evidence was not sufficient to support a conclusion that the door latch was defective; in fact, he said that the evidence was "conclusively negative." As noted above, that decision is not manifestly erroneous. Thus, the refusal to include the requested instruction was reasonable.

F. Conclusion on liability issues

Accordingly, the trial court judgment in favor of the plaintiffs and against Goodyear is reversed and plaintiffs' claims against Goodyear are dismissed with prejudice. The judgment in favor of the plaintiffs and against Delgado/State is affirmed. The judgment exonerating Ford from liability is also affirmed. Delgado/State, as the only party responsible for the accident, is therefore cast for 100 percent of the plaintiffs' damages.

IV. DAMAGES

Delgado/State, which is now the only remaining defendant in the case, appealed each of the damage awards given to the individual plaintiffs, claiming that all of the awards are excessive.
Generally, the discretion to set general damage awards given to the trier of fact is "`great,' and even vast, so that an appellate court should rarely disturb an award of general damages." Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Indeed, assessment of damages is within the *442 province of the factfinder, and should not be disturbed in the absence of manifest error. Jeffries v. Estate of Pruitt, 598 So.2d 379 (La.App. 1st Cir.), writs denied 599 So.2d 306 and 605 So.2d 1124 (La.1992). The appellate court should not consider whether a different award might have been more appropriate, but whether the award made by the trial court is reasonably supported by the record. Warner v. Great Atlantic & Pacific Tea Co., 583 So.2d 61 (La.App. 2d Cir.1991); Ferguson v. Village of Dry Prong, 580 So.2d 1015 (La.App. 3d Cir.), writ denied 585 So.2d 570 (La.1991). This rule is a recognition of the fact that "[r]easonable persons frequently disagree about the measure of general damages in a particular case." Youn, at 1261.
However, Louisiana Constitution article 5, § 10(B) does require appellate courts to review trial court records and render judgments on quantum based on the merits of the case by considering whether the factfinder abused its "much discretion" in setting the damage awards. Carollo v. Wilson, 353 So.2d 249 (La.1977); Coco v. Winston Industries, Inc., 341 So.2d 332 (La.1976).
In order to determine whether the trial court abused its much discretion, the appellate court must look first, not to prior awards for similar injuries, but to the individual circumstances of the case. Reck v. Stevens, 373 So.2d 498 (La.1979); O'Brien v. Remington Arms Co., 601 So.2d 330 (La.App. 2d Cir.), writ denied 604 So.2d 1003 (La. 1992); Ferguson, 580 So.2d 1015. To decide whether the quantum is excessive, the appellate court must view the evidence in the light most favorable to the plaintiff; conversely, to determine if the quantum is inadequate, the appellate court must view the evidence in the light most favorable to the defendant. O'Brien, 601 So.2d 330; Higginbotham v. Ouachita Parish Police Jury, 513 So.2d 537 (La.App. 2d Cir.1987).
Only after performing an "articulated analysis" of the record may the appellate court determine that the trial court abused its discretion in setting the award. O'Brien, 601 So.2d 330; Sharkey v. Sterling Drug, Inc., 600 So.2d 701 (La.App. 1st Cir.1992). The reviewing court must evaluate the particular injuries involved, as well as the effect of those injuries on the particular persons injured. Samuels v. Southern Baptist Hospital, 594 So.2d 571 (La.App. 4th Cir.), writ denied 599 So.2d 316 (La.1992).
After deciding that the trial court abused its discretion, the appellate court is constrained in setting the new award to raising or lowering the award only to the highest or lowest point reasonably within the discretion of the trier of fact. Perniciaro v. Brinch, 384 So.2d 392 (La.1980); Carollo, 353 So.2d 249; Jeffries, 598 So.2d 379. The appellate court may look to prior awards in similar cases at this point in order to determine the proper quantum. Reck, 373 So.2d 498; O'Brien, 601 So.2d 330.
When a damage award given by a trial court is ambiguous, the appellate court must determine a proper and fair award on the basis of careful consideration of all the record evidence. Dull v. Employers Liability Assurance Corp., 233 So.2d 43 (La.App. 2d Cir.1970).
The issues relative to each plaintiff's damage award will be considered below in the light of the above principles of law. The cases are presented in descending order based on the size of the awards given.

A. Mickey Maitre

Mickey Maitre, who was center fielder for the Delgado baseball team, was awarded a lump sum award of $2,002,717.75 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Maitre's injuries, viewed in the light most favorable to Maitre, is summarized below.
When the accident occurred, Maitre was thrown through a side window of the van. Maitre landed on the ground in the median of the interstate, and the van landed on top of him, with the exhaust pipe against his chest. When Maitre felt the exhaust pipe burning through his clothing, he grabbed the pipe with his left, dominant hand and moved it off his chest, causing severe burns to his hand. Additionally, his lower right leg was pinned beneath the axle of the van. Maitre was trapped under the van approximately 30 minutes, *443 during which time he suffered severe pain. He testified that he spat up blood and had trouble breathing. He was conscious the whole time, and stated at trial that he was terrified that the van was going to blow up.
1. Damages
a. Special damages
(1) Past medical expenses
Maitre was transported to Slidell Memorial Hospital, where he was initially treated by a regular surgeon, Dr. Earl Gravois, as well as an orthopedic surgeon, Dr. Jord Sanchez. Dr. Gravois testified by videotape that he diagnosed a bruise to Maitre's lung, a dislocated hip accompanied by pelvic fractures, a contusion to the kidneys, peritonitis, and burns on both hands, both forearms, and his right thigh. He found that Maitre had no motor function in his right leg. In short, Dr. Gravois found that Maitre was in a life-threatening condition for the first 24 hours or more after the accident. Dr. Gravois performed exploratory surgery to Maitre's abdomen. He testified that he placed a feeding tube at that time because of Maitre's breathing problems. Additionally, Maitre was placed on a ventilator tube and a nasal-gastric tube, as well as a Foley catheter.
Dr. Sanchez stated that Maitre's major orthopedic problem was a fracture dislocation of the right hip joint. Additionally, Maitre suffered dislocation of the right sacroiliac joint and sciatic nerve palsy, as well as another dislocation of the hip and cracks in the pubis bones. Furthermore, Maitre suffered burns on both hands, a burn to the right thigh, and a laceration to the front of the right leg between the knee and the ankle, all of which required orthopedic care. Dr. Sanchez performed surgery to repair Maitre's hip and applied a pelvic fixator device to stabilize the pelvis. Additionally, Dr. Sanchez surgically removed the lacerations and placed a skeletal fracture pin in the upper part of Maitre's right leg bone, which was used to put Maitre in traction. He said that he lacked the necessary expertise to properly treat Maitre's burns, but he did a burn excision and debridement.
Dr. Thomas Crais Jr., an expert plastic surgeon with experience with burns, was called in to treat the burns on Maitre's hands and thigh. Dr. Crais first saw Maitre at Slidell Memorial two days after the accident, when he diagnosed second and third degree burns to Maitre's hands. Maitre was then transferred to Southern Baptist Hospital in New Orleans, where Dr. Crais performed surgery to excise the burns and to do skin grafting on May 1. In order to do the skin grafting, Dr. Crais removed layers of skin from Maitre's thigh and attached it to the burned areas with staples. The first skin graft on the left hand did not take, and Dr. Crais performed a second procedure on May 22; that procedure was successful.
Dr. Robert Ruel, Jr., an expert in orthopedics, treated Maitre for his orthopedic problems after Maitre was transferred from Slidell Memorial. Dr. Ruel testified that he saw Maitre daily at Baptist Hospital for 22 days. He said that he adjusted both the pelvic fixator device and the traction daily. Adjustment of the pelvic fixator required that Maitre undergo daily x-rays. Additionally, the fixator device had to be cleaned at the four pin sites daily. Once Maitre was released by Dr. Crais, he was transferred from Baptist Hospital to Methodist Hospital, where Dr. Ruel continued to treat Maitre's orthopedic problems.
All together, Maitre was hospitalized, at three different hospitals, for 57 days, seven days of which were spent in the intensive care unit. He was forced to undergo four separate surgeries under general anesthesia. Shortly after the accident, he had as many as six different instruments and tubes inserted into his body. He was in traction 24 hours a day, seven days a week, for approximately six weeks, during which time he was confined to a bed flat on his back. He wore the pelvic fixator device for 118 days.
Maitre presented evidence of the following past medical and vocational rehabilitation expenses:

 Internal Medicine Group $ 885.00
 Vickey Kelly (therapist) 479.00
 Jobst Institute 1,204.07
 Chalmette Medical Home
 Health Supplies 722.25
 Humana Hospital 725.00

*444
 Mahorner Clinic 1,410.00
 Anesthesia East 292.00
 New Orleans Radiology 395.00
 Napoleon Pathology 64.25
 North Lake Radiology 325.00
 Dr. Thomas Crais 9,220.00
 Dr. Robert Ruel 7,196.00
 Radiology Medical Association 400.00
 New Orleans Anesthesia 2,317.00
 Slidell Memorial Hospital 23,668.23
 Southern Baptist Hospital 21,272.05
 Methodist Hospital 10,832.90
 Dr. Neil Gorman 2,210.00
 Dr. Jord Sanchez 1,700.00
 Dr. Oliver Sanders 3,400.00
 _________
 TOTAL $88,717.75

(2) Future medical expenses

The only evidence presented at trial that Maitre would need future medical care as a result of the accident was the testimony of Dr. Ruel that Maitre would need to see a doctor approximately once a year at a cost of $40 to $50 for the rest of his life. Additionally, Dr. Ruel said, Maitre would need yearly x-rays at a cost of approximately $115. Furthermore, Oliver Sanders Jr., an expert psychiatrist, stated that Maitre would probably continue to have some intermittent problems with anxiety and depression for the rest of his life and that Maitre "may" need more counseling, although no estimated costs for that treatment were suggested. The record also contains evidence that Maitre needs muscle relaxants and pain medication.

(3) Lost earnings

At the time of the accident, Maitre was a Delgado college freshman in a two-year business program. Subsequent to the accident and prior to the trial, Maitre completed that program and secured first a part-time job, then a full-time job, as a teller in a bank. Maitre testified that he was earning approximately $5 per hour at the time of the trial.
Maitre claims, however, that had the accident not occurred, he would have earned a four-year business degree. He says that his depression and emotional problems caused by the accident prevented him from being academically successful at Tulane University, where he attended classes for three semesters, but finally left because he had been placed on academic probation.
At trial, Maitre presented the testimony of Cornelious Gorman, Ph.D., a vocational rehabilitation expert. Dr. Gorman testified that Maitre will be able to earn as much as $22,000 to $25,000 with experience and the right job placement, but that he could have started at $19,500 to $30,000, if he had been able to earn a four-year college degree. Dr. Gorman said that he did not feel that he could find Maitre any job other than the one he currently had and that his employment would probably be limited to $5 per hour. He felt that it was unlikely that Maitre could obtain a manager's position earning $35,000, despite a favorable appraisal of his performance as a teller from his superiors.
Seymour Goodman, an expert economist, testified that Maitre's work life expectancy was 35.7 years and his life expectancy was 46.5 years at the time of trial. He calculated Maitre's past wage losses, based on an earning capacity of $22,500, at $16,663.21. His discounted future wage losses, Goodman said, totalled $297,606.02. Goodman admitted that the amounts would be different if Maitre started at minimum wage.
The defendants presented contradictory testimony on this issue from Jonathan Stuart Wood, an associated professor of economics and finance at Loyola University. Wood admitted that economists have problems estimating lost income in cases like this where the injured party previously had no income, saying that any estimates are strictly speculative since the conclusions are only as valid as the assumptions. Opining that Maitre was actually earning roughly the same amount as other people with his characteristics, Wood said that Maitre had no past lost income, if you assume that he would start as a teller at a local bank. His calculation of future lost wages was based on projected earnings of $14,816.60, the mid-point between minimum wage and $22,000 a year. Maitre's future losses using that figure were approximately $54,000, assuming two percent raises per year; $72,000, assuming four percent raises per year; and $90,000, assuming six percent raises per year.
b. General damages
(1) Pain and suffering
(a) Physical pain
The record in this case is replete with testimony of the extent of pain and suffering *445 experienced by Maitre. As noted, Maitre was conscious during the entire period that he was trapped under the van. Tom Miller, the Slidell police officer who was the team leader for the extrication unit, testified that Maitre was screaming from pain while he was on the scene.
After the initial surgeries, Maitre was in traction for six weeks 24 hours a day, seven days a week, enduring constant pain from the weight placed on his leg. Additionally, he wore a pelvic fixator device for 118 days, which he described as "torture." The skin from his body would grow up around the screws which attached the device to his body, and the area had to be scraped three times a day, which Maitre said was very painful. The removal of the staples from the skin graft on his hand was also very painful, Maitre said. Furthermore, he suffered severe pain when the muscles in his right leg were "shocked" to "get the nerve moving again."
Maitre also testified as to pain caused by his attempt to resume his normal activities after the accident, especially the pain caused by his trying to return to playing baseball. He claimed that he still had pain in his hand from doing everyday things at the time of the trial, as well as pain in his hip from walking. Additionally, he said that he has trouble with his back.

(b) Mental pain and suffering

Maitre stated that he was terrified during the entire time that he was trapped under the van that the van would blow up. To make matters worse, he could hear the flesh that came off his left hand when he grabbed the exhaust pipe of the van sizzling, and he could smell his flesh burning. Maitre also testified as to the fear he suffered shortly after the accident that he would be paralyzed or crippled, since he was initially unable to move his right leg. Additionally, Maitre said that he worried about having so many x-rays. Further, he said that he had a phobia about riding in vans after the accident.
However, most of the evidence on mental pain and suffering presented at trial centered around Maitre's depression and anxiety resulting from the fact that he was no longer able to participate in sports activities, especially in playing baseball, after the accident. He testified that he became severely depressed while he was in the hospital because he felt that he would never again be able to do the things he loved to do. This depression resulted in sleeplessness and in bad nightmares.
The fact that Maitre suffered certain mental and emotional problems after the accident was corroborated by the testimony of Dr. Oliver Sanders, the psychiatrist. Dr. Sanders stated that he first saw Maitre on September 18, 1987, and that Maitre told him that he did not feel secure, that he was nervous, that he was self-conscious about his scars, and that he had lost a lot of his confidence. Sanders felt that Maitre suffered from depressive disorder and anxiety problems caused by the accident. The testimony of Claire Maitre, Maitre's mother, also corroborated this testimony.

(2) Residual physical disability

Maitre's testimony indicated that he continued to have problems with his hands, hips, and back up to the time of the trial. Concerning his hands, Maitre said that he continues to have pain while trying to perform everyday kinds of tasks. He stated that his hips hurt when he walks a lot. Furthermore, he testified as to pain in his back.
Dr. Gorman testified that Maitre told him about several continuing problems. Gorman said that Maitre's "basic problems" were intolerance for long standing and problems with lifting. He said that Maitre had difficulty walking and handling bags of change, two activities required by his job as a bank teller. Maitre's mother's testimony also mentioned his residual physical disabilities.

(3) Loss of enjoyment of life

The evidence presented at trial on this issue centered around the fact that Maitre is no longer able to participate in sports activities, especially baseball. Both Maitre and his mother testified that Maitre had wanted to be a professional baseball player all of his life. Maitre's testimony indicates that he was simply unable to go back to playing the *446 sports after the accident because it was too painful. This testimony, coupled with the evidence that Maitre was a talented baseball player prior to the accident, are sufficient to prove that Maitre did indeed lose some of his enjoyment of life.

2. Evidentiary Issues

The defendants raise two evidentiary issues related to the Maitre trial: (1) admission of testimony concerning Maitre's "loss" of a speculative professional baseball career, and (2) admission of a videotape of Maitre's injuries coupled with exclusion of photographs of Maitre's healed hand. Maitre also argues that the trial court improperly excluded evidence offered to prove his case.
First, the defendants contest the trial court's admission of testimony and evidence concerning Maitre's "dream" of pursuing a career in professional baseball, claiming that the evidence was, among other things, speculative, cumulative, and prejudicial. However, the trial judge strictly limited the evidence on this issue to the psychological impact that the "loss of the opportunity to pursue that dream" had on Maitre. Additionally, the trial judge told the jury that no evidence that Maitre would have become a professional ball player had been presented, and that the testimony concerning the "loss of Maitre's dream" could only be considered as evidence of mental suffering and loss of enjoyment of life. Thus, we find that the evidence admitted was not unduly prejudicial to the defendants.
The defendants also contest the trial court's decision to allow Maitre to introduce allegedly improper evidence of his injuries, including a "gruesome, inflammatory videotape" of his injuries, taken at Southern Baptist Hospital shortly after the accident, while at the same time excluding photographs of Maitre's healed hand, offered by Goodyear. Concerning the videotape, the appellants claim that it was improperly admitted, even if it was relevant, because it was cumulative of testimony given by Maitre and his treating physicians. The bottom line, they say, is that the prejudicial effect of the videotape far outweighed its probative value. However, we find that the videotape was neither prejudicial, cumulative, nor inflammatory since it showed Maitre's condition shortly after the accident more effectively than any of the other evidence presented at trial.
The State also complains of the trial court's decision to allow Maitre to introduce photographs of the pelvic fixator device and blood-stained Jobst gloves. Further, the State contests a "full showing of body scars," which required that Maitre strip down to swimming trunks. Finally, the State argues that the trial court improperly allowed "extensive" testimony concerning Maitre's pain, as well as allowing Maitre to weep on the stand. However, a trial judge has great discretion in making decisions concerning admission of evidence. We find no reversible error in any of the trial court's decisions to admit the evidence contested by the defendants.
Concerning the exclusion of the photographs offered by Goodyear, although the appellants admit that the jury members were allowed to view and even touch Maitre's hand at the time of the trial, they claim that the jury should have had the photographs available while they were considering their verdict. Again, we find no error in excluding the photographs, since the jury was allowed to actually view the "healed hand," which is actually better evidence than the photographs.
Maitre answered the appeal and claims in brief that the trial court improperly prohibited or restricted evidence on the following issues: (1) that he would have received a Tulane scholarship, (2) that he was unable to complete a four-year college degree, (3) that his earning capacity has been diminished because he is unable to engage in manual labor jobs, (4) that he lost much of his enjoyment of life, (5) that his playing ability and physical abilities were diminished, (6) that he lost his dream of attaining a professional baseball career, and (7) that his injuries were extensive. However, we find evidence on all of these issues in the trial court record. Therefore, we find no merit in Maitre's arguments on these issues.

*447 3. Quantum arguments

In arguing that Maitre's award is excessive, despite his extensive injuries as detailed above, the defendants focus on the fact that by the time of trial, Maitre had recovered and was able to pursue normal activities. The defendants concede that Maitre was seriously injured in the accident, but argue that he experienced a "remarkable, though not complete, recovery." The defendants emphasize the facts that Maitre attempted to return to playing baseball for Delgado within a year of the accident, and that he engaged in a vigorous, voluntary, self-imposed fitness program within 15 months of the accident. Additionally, Maitre played varsity baseball at Tulane University beginning in the Fall of 1989. Concerning his career, the defendants claim that Maitre is pursuing the career in banking which he wanted to pursue at the time of the accident. They claim that the evidence indicates that Maitre has little residual limitations caused by disability attributable to the accident. They say the trial court's award is excessive in light of Maitre's actual post-accident accomplishments.

4. Maitre's award

Considering all of the above evidence and arguments, this court finds that the $2,002,717.75 award to Maitre is not reasonably supported by the record in the case; therefore, the trial court abused its much discretion in setting the award. According, we have determined that the following amounts are the highest the judge could reasonably have awarded Maitre for his various items of injury:

 Past medical expenses $ 88,717.75
 Future medical expenses 7,590.00[9]
 Lost earnings
 Past lost earnings 16,663.00
 Future lost earnings 297,606.00
 General damages 1,250,000.00
 ____________
 TOTAL $1,660,576.75

Accordingly, the trial court award to Maitre is hereby reduced from $2,002,717.75 to $1,660,576.75. This amount is subject to a credit of $57,255.48 for medical expenses previously paid by the state.[10]

B. Davey Paul Clement

Davey Paul Clement, who was a member of the pitching staff for the Delgado baseball team, was awarded a lump sum award of $1,000,000 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Clement's injuries, viewed in the light most favorable to Clement, is summarized below.
Immediately after the accident, Davey Phillips, another passenger in the van, found Clement under the edge of the van in front of the rear tire. Phillips testified that Clement was lying on his back, with his head out from under the van. However, the van was resting on both of his legs and he was curled up with his knees next to his chest. Clement was not moving, Phillips said.
1. Damages
a. Special damages
(1) Past medical expenses
(a) Physical injuries
Clement was transported to Northshore Regional Medical Center, where he was examined by Dr. Edward M. O'Brien, who is a general surgeon. Initially, Dr. O'Brien found that Clement was unconscious and in acute primary respiratory distress. Additionally, Clement had suffered a severe pulmonary contusion, or bruise to the lungs. In fact, Dr. O'Brien said that Clement was very close to death when he arrived at the hospital because his oxygen level was very low; as a result, Clement was cyanotic, meaning he was blue from decreased oxygen and increased *448 carbon dioxide. Additionally, Dr. O'Brien was initially concerned that the blunt trauma injury to Clement's lung might have extended to Clement's heart, but that fear later proved to be unfounded. Clement was placed on a mechanical ventilator to maintain the oxygenation level of his lungs; he remained on the ventilator for two days.
Additionally, Dr. O'Brien stated, Clement suffered the most serious type of closed head injury, causing a bruising of the brain. Clement remained unconscious for four to five days, which Dr. O'Brien said indicated significant cerebral injury. However, Dr. O'Brien stated that cranial CAT scans were normal, as was the plain film of Clement's skull. No EEG was performed at Northshore. Dr. O'Brien also found Clement's neurological exam to be within normal limits at the time of his discharge from the hospital, but he referred Clement to Dr. Bert A. Bratton, a neurosurgeon.
Dr. O'Brien stated that Clement also suffered multiple contusions, lacerations, burns, and bruises. Dr. O'Brien performed surgery under a local anesthesia on a particularly severe laceration on Clement's forearm. That wound later had to be reopened and debrided for removal of particles of glass.
Dr. O'Brien also found evidence of abdominal trauma, since Clement's abdomen was distended. Additionally, Dr. O'Brien found a displaced fracture of the shoulder, and said that he later found evidence of an orthopedic injury to the shoulder. Clement underwent placement immobilization of the shoulder by wearing a sling.
After his release from the hospital, Clement consulted Dr. Raul G. Reyes, an orthopedic surgeon. Dr. Reyes testified that he first saw Clement on June 13, 1986, some six weeks after the accident. At that time, he found that Clement had a lumbo-sacral strain of two months duration, as well as a left shoulder injury consisting of a fracture of the humeral tuberosity and fracture of the shoulder blade. Dr. Reyes referred Clement for physical therapy, and saw Clement every two weeks until September 11, 1986.
Dr. Reyes later examined Clement again on December 11, 1986, at which time Clement was complaining that his back and shoulder were bothering him. After x-raying the affected areas, Dr. Reyes recommended that Clement restart the physical therapy program. Clement next consulted Dr. Reyes on March 23, 1987, when he again complained about his back; Dr. Reyes advised him to discontinue pitching because of complaints of pain in the right shoulder.
On April 8, 1987, Dr. Reyes diagnosed an ankle fracture, which he believed related back to the accident. Dr. Reyes stated that Clement suffered a chip fracture in his ankle. Chip fractures, he said, normally do not heal, but stay present for life.
Clement continued to complain of back and shoulder pain during his visits to Dr. Reyes through August of 1987. When Dr. Reyes discharged Clement on September 11, 1986, he noted "no evidence of disability."
Clement later consulted Dr. B.J. Zeringue, an orthopedic surgeon, beginning on June 14, 1989. On his first visit, Clement told Dr. Zeringue that he had re-injured his left shoulder the day before while trying to show some youngsters how to bat. Dr. Zeringue ordered x-rays, which revealed a healed fracture of the left shoulder. Dr. Zeringue felt that the healed fracture, which showed calcification, was causing Clement episodic chronic pain and discomfort. Additionally, he felt that Clement was experiencing tendonitis and left-shoulder synovitis, which is inflammation of the synovial tissues surrounding the shoulder joints.
Based on his examination and findings, Dr. Zeringue thought that Clement might be suffering from a glenoid rim tear and/or an old rotator cuff tear. He recommended anti-inflammatory medication and a sling. Although Clement showed some improvement, he continued to have shoulder problems over the next year, Dr. Zeringue said. On June 10, 1991, Dr. Zeringue concluded that Clement's shoulder problem was probably a permanent condition and assigned Clement a 30 percent permanent loss of function disability rating of the left shoulder. As a result of this rating, Clement has work restrictions, Dr. Zeringue stated. Although Dr. Zeringue admitted that he could not be absolutely certain that the shoulder injury was caused *449 by the accident, he thought that it was because of the evidence of old injury on the x-rays and because of Clement's statement that he had experienced pain in the shoulder since the accident.

(b) Mental injuries

Dr. O'Brien testified at trial that Clement suffered two different injuries which could have caused organic brain damage as a result of the accident. First, Dr. O'Brien noted that Clement suffered a closed-head injury. Second, he noted that Clement was hypothymic, meaning that he had low blood oxygen.
After his release from the hospital, Clement consulted Dr. Maria Palmer, a specialist in neurology, beginning on June 18, 1986. Dr. Palmer testified that Clement said he was having headaches and memory loss, and that he could not remember the accident. Additionally, Clement told Dr. Palmer that he was having difficulty concentrating and sleeping, and that he was experiencing numerous nightmares. Further, Clement claimed that he was afraid to ride in cars since the accident.
Dr. Palmer's initial examination revealed that Clement was experiencing poor coordination, including difficulty walking a straight line and putting his finger on his nose, symptoms which Dr. Palmer said indicated some sort of generalized brain damage consistent with decreased oxygen. Additionally, Dr. Palmer felt that the symptoms might be related to a post-concussive syndrome. She suggested a neuropsychological evaluation, an EEG, and a MRI of the brain. Additionally, Dr. Palmer recommended that Clement consult a psychiatrist for treatment of post-traumatic neurosis.
The EEG performed on Clement showed "more slow waves than normal" in the temporal lobe, which is the area of the brain involving memory, Dr. Palmer said. A repeat test showed exactly the same problem, indicating a permanent malfunction of that area of the brain, resulting in organic brain damage, Dr. Palmer said. These test results correlated with Clement's symptoms, she said. Additionally, Dr. Palmer said, the results of Clement's neurological examination showed the same results, even more objectively.
Dr. Palmer said that Clement's problems were probably permanent since they were present two years post-accident. She noted that the longer a person is unconscious because of a closed head injury, the more likely it is that he will experience brain damage. Dr. Palmer said that she could not offer Clement any type of treatment which would help him with his problems.
Dr. Susan Andrews, a clinical psychologist, saw Clement twice on referral from Dr. Palmer. Clement reported the same types of problems to Dr. Andrews that he had previously reported to Dr. Palmer. Dr. Andrews administered the Wechsler Adult Intelligence Scale to Clement, who scored a full scale IQ of 99, which Dr. Andrews classified as "average." Dr. Andrews testified that further testing revealed the following: subtle problems with sustained concentration, inconsistencies in attention, problems with finding names for things. When all these problems are considered together, a pattern emerges, Dr. Andrews said. She also tested Clement in three academic areas, finding that he scored above 12th grade in spelling, but below the 50th percentile in both reading and math. Dr. Andrews said that the test results pointed to problems with the left hemisphere of Clement's brain. She found the worst problems in Clement's ability to learn new verbal material, although he had a good memory for visual information.
On a second evaluation, Dr. Andrews found improvement in a "large number of tests," which she said indicated that much of his organic brain damage might improve over time. However, the second tests showed residual problems with verbal memory and learning, problems which were not likely to improve, problems which affect his ability to learn in school and to work, problems which affect his everyday life.
Clement also consulted Dr. Chester B. Scringnar, a psychiatrist, who diagnosed Clement as suffering from post-traumatic stress disorder (PTSD) and organic brain damage; the last diagnosis was based on test results from Dr. Palmer and Dr. Andrews. Dr. Scrignar testified that Clement's thinking, *450 problem solving, and memory skills are affected by his condition. Additionally, Dr. Scrignar said that Clement's brain had been irreparably, permanently damaged by neuronal shearing, which would not necessarily show up on x-rays. He also stated that lack of oxygen can damage or injure the brain in proportion to the amount of time the brain was deprived of adequate oxygen.
Clement presented evidence of the following medical expenses:

 Dr. James R. Gosey, Jr. $ 123.00
 Dr. E. Michael O'Bryan 1,275.00
 350.00
 Northshore Regional Medical
 Center 12,965.10
 Susan Andrews, Ph.D. 1,500.00
 Dr. Maria Palmer 1,085.00
 Jefferson Imaging Center 650.00
 Dr. V.J. Zeringue 665.00
 Dr. Raul G. Reyes 525.00
 Terry's Drugs 28.92
 Tulane Medical Center 189.92
 70.00
 Dr. Bert R. Bratton (ICU) 270.00
 _________
 TOTAL $19,696.94

(2) Future medical expenses

The only evidence of future medical expenses for Clement's physical injuries was Dr. Zeringue's testimony that Clement's shoulder disability might continue to deteriorate as he gets older, and that a shoulder joint replacement might be necessary at some point in the future. Such an operation would cost $20,000 to $25,000 in today's dollars, Dr. Zeringue said. Additionally, Dr. Zeringue said that Clement would probably need medication for the shoulder problem for the rest of his life, at a cost of $100 to $200 per year, as well as orthopedic care, at a cost of approximately $100 per year.
Concerning future medical expenses for Clement's mental injuries, both Dr. Scrignar and Dr. Andrews felt that Clement could benefit from a cognitive rehabilitation program, which would help him manage the functional problems caused by his organic brain damage. Dr. Scrignar stated that such a program would cost about $16,000 a month; he did not estimate the amount of time the treatment would take. Dr. Andrews said cognitive rehabilitation would probably cost $700 to $800 per day. She said Clement would need a six-to nine-month program, starting with a five-day-a-week program for some three to four months, tapering to a three-day a week program, and finally to a two-day-a-week program. She estimated the cost at $16,000 per month for the first six months, then $8,000 per month, and finally $3,000 to $4,000 per month at the end of the treatment. Additionally, Clement would need several years of followup, Dr. Andrews opined. She estimated the total costs of "seeing if he could be helped" in the $100,000 range.

(3) Lost earnings

At the time of the accident, Clement was a Delgado college freshman. After the accident, Clement transferred to Jones Junior College, where he completed a two-year program. Thereafter, Clement attended Northeast Louisiana State University, where he eventually obtained a degree in physical education and coaching. In order to complete that program of study, Clement was required to complete a semester of student teaching at Quachita Junior High School.
However, following his graduation from college, Clement was unable to obtain a teaching or coaching job, primarily because of his failure to pass the National Teacher's Examination (NTE), despite repeated attempts to obtain the necessary test scores. Dr. Andrews stated at trial that the organic brain damage suffered by Clement, which causes problems with visual memory and learning, could cause problems in taking the NTE. Normally, Dr. Andrews stated, a person with Clement's IQ would not have problems passing the NTE. Dr. Andrews also stated that she would be unable to recommend that an employer hire Clement to work with children because of his brain damage.
As a result of his inability to obtain a teaching job, Clement presented evidence of lost earnings. Ernest Huval, a counsel actuary and expert in actuarial science, testified that Clement would suffer a total future earnings loss of $372,274 over his expected work lifetime. In order to estimate that number, Huval testified that he had to assume a $1500 a month wage loss. He further had to assume a 30 percent disability. His *451 figures were based upon an average public school teacher salary of $18,000 per year.
Clement also presented evidence that he would be unable to perform most manual labor type jobs because of the 30 percent disability of his left shoulder. Thus, Huval made further lost earnings calculations based on an assumption that Clement could earn minimum wages, saying his total lost future wages under that scenario would be $180,622.
Concerning past lost wages, Huval stated that Clement had lost $5460 a year, assuming that he would have worked part-time 25 hours per week at $4.20 per hour. Huval said that none of his figures included increases, interest, or fringe benefits.

b. General damages

The only evidence in the record of physical pain and suffering is the medical evidence that Clement complained consistently of pain in the back and shoulder during the periods of time he was consulting the various orthopedic doctors. Clement's own testimony is practically devoid of any mention of either physical or mental pain and suffering, although he does say at one time that he had dreamed of being a professional baseball player.
However, the record does contain evidence of residual disability, both physical and mental. As previously noted, Dr. Zeringue assigned a 30 percent disability to Clement's left shoulder, which results in serious work restrictions. That physical disability is also the primary reason that Clement is unable to play baseball.
Concerning Clement's residual mental disability, the medical evidence concerning his difficulty with visual memory and learning was presented. Additionally, the testimony of Clement, his father, and his friend Davey Phillips was presented. Clement testified that he was changed by the accident, that he is a "whole different person," that he "can't talk," that in fact he can't do a lot of things, "like make decisions." Clement's testimony also demonstrated some difficulty in understanding questions. Additionally, Clement said that one reason he is no longer able to play baseball is the fact that he is now unable to remember the pitches.
Clement's father, Earnest A. Clement Sr., stated that Clement has been "very different" since the accident. He noted that Clement cannot do many of the things he wants to do, that he forgets things, and that he stutters sometime. Additionally, Clement's father said that he now blinks his eyes and stares a lot. He said that Clement is unable to live alone because he "loses track of what's going on." Clement's father said that he has a "very, very short memory."
Davey Philips testified that Clement is quieter since the accident, and that Clement told him that he has trouble sleeping and that he experiences nightmares.

2. Evidentiary issues

The defendants contest the trial court's refusal to hold the case open or issue a bench subpoena when a witness who would have testified concerning Clement's future prospects in obtaining a teaching job failed to show, while allowing Clement extra time to obtain the testimony of a rebuttal witness; Clement claims the trial court decision was appropriate because the witness was not listed on the pre-trial order. The State contests the trial court's actions allowing argument between counsel and commenting on the evidence during this trial; Clement says the argument should not be considered because the State failed to object at the time of trial. We find no reversible error based on either of these arguments.

3. Quantum arguments

The defendants focus most of their arguments that the quantum award to Clement is excessive on an attempt to undermine Clement's claims that he is unemployable as a result of organic brain damage and PTSD. First, they question the brain damage diagnosis, noting that the alleged damage was not discovered until approximately two years after the accident and arguing that the diagnoses were questionable because the medical experts indicated that the evidence of the damage was tentative. More importantly, the defendants claim, the facts of Clement's post-accident life and achievement undermine *452 the argument. They point out that, following the accident, Clement went on to earn an athletic scholarship at Northeast Louisiana University, where he received a four-year degree in education and successfully completed a student teaching requirement. Additionally, his grades indicated that his academic ability was extensive, the defendants say.
Specifically, the defendants contest any award to Clement for loss of earnings. In support of this argument, the defendants presented testimony that Clement has the ability to perform as a classroom teacher and coach despite his alleged brain damage from Robert Simms, the athletic director at Quachita Junior High who supervised Clement's student teaching activities. Simms, who awarded Clement an "A" for his student teaching activities, said that Clement did a good job communicating and presenting lessons to the students. He said that he saw no abnormal communication problems, memory lapses, inability to think of words, or concentration problems during Clement's student teaching tenure.
Additionally, the defendants argue that Clement could easily pass the NTE if he tries again because at the time of trial he had passed all but one section of the exam and his last score on that section was within 10 points of the necessary score. The defendants also presented the testimony of a representative of the Louisiana State Department of Education that Clement was eligible at the time of trial for a temporary teaching certificate, provided certain requirements were met. However, the judge heard all of this evidence and nevertheless credited Clement's assertion that he will remain forever unable to obtain a teaching job because of his organic brain damage.
The defendants also attempted to minimize the effect of Clement's physical injuries, pointing to his return to playing college baseball as evidence of little residual physical disability.
Clement claims that the $1,000,000 award was appropriate under the evidence, pointing primarily to testimony that his alleged brain damage changed him greatly, making him unable to remember things or to function normally. He claims that it took him six years to earn his four-year degree and that his brain damage prevents him from pursuing his goal of becoming a teacher, while his residual pain and other physical disability prevents him from pursuing his goal of becoming a professional baseball player.

4. Clement's award

Considering the above evidence and arguments, this court finds that the $1,000,000 award to Clement made by the trial court is reasonably supported by the record; thus, the trial court did not abuse its much discretion in setting the award. The record reveals the following special damages:

 Past medical expenses $ 19,696.94
 Future medical expenses 126,350.00[11]
 Lost earnings
 Past lost earnings 5,460.00
 Future lost earnings 372,274.00
 ___________
 TOTAL $523,780.94

Once the above special damages are subtracted from the $1,000,000 award, $476,219.06 remains as general damages. The record supports this award. Therefore, the $1,000,000 award is affirmed, subject to a credit for $22,143.97 in medical expenses previously paid by the State.

C. Alton Sartin

Alton Sartin, who was a pitcher for the Delgado baseball team, was awarded a lump sum award of $450,000 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Sartin's injuries, viewed in the light most favorable to Sartin, is summarized below.
When the accident occurred, Sartin was seated in the front passenger seat of the van, next to the sliding door. He was not thrown from the van during the accident, but remembers lying on the side of the road while paramedics put him in a bag, apparently to *453 stop the bleeding from a laceration in his back.
1. Damages
a. Special damages
Sartin was taken by ambulance to the Slidell Memorial Hospital, where the laceration on his back was first sutured, then reopened to remove glass, then resutured with 60 stitches. The laceration was some six inches long. Sartin was then allowed to go home.
However, a couple of days later, on April 29, 1986, Sartin reported to the emergency room at Hotel Dieu Hospital, complaining of blood in his urine and abdominal pain. Dr. Joseph D. Persich, the Delgado baseball team doctor, treated him at Hotel Dieu. Sartin was hospitalized from April 29 to May 1, 1986. During that time, Sartin submitted to several diagnostic tests, including an intravenous myelogram and catherization to obtain a sample for urinanalysis. Since Dr. Persich could find no evidence of a ruptured kidney, he diagnosed Sartin's problem as a bruised kidney.
Sartin also suffered a glenoid tear in his right shoulder, which Dr. Michael Brunet attributed to the accident in the van. The first evidence of the shoulder problem in the record is found in a September 24, 1986 visit to Dr. Persich. The problem was eventually diagnosed by Dr. Brunet, who first saw Sartin on December 19, 1986. Dr. Brunet performed arthroscopic surgery to repair the tear on January 9, 1987. He then followed Sartin until February 19, 1987.
Sartin presented evidence of the following past medical expenses:

 Northshore Hospital $ 333.60
 Hotel Dieu Hospital 821.80
 Dr. J. Donald Persich 155.00
 Dr. J. Agoro-Ombaka 1,250.00
 Dr. John Angelo 95.00
 Dr. Roy Marrero 65.00
 Dr. Michael Brunet 1,102.00
 Tulane Medical Center 1,612.30
 Hotel Dieu Hospital 118.40
 Dr. T. Lamar Teaford 175.00
 ________
 TOTAL $5,728.10

The record in this case contains no evidence of any future medical expenses, lost wages, or other special damages suffered by Sartin.

b. General damages

Concerning physical pain and suffering, Sartin testified that he was sore all over for a few days immediately after the accident. Then, he had abdominal pain at the time that he noticed blood in his urine and reported to the Hotel Dieu emergency room. The record contains no evidence that Sartin experienced pain from the laceration on his back; in fact, he stated that he felt "fine" when he arrived at the hospital, although he found the fact that so many people were working around him a bit overwhelming. Additionally, Sartin testified as to the pain in his shoulder when he started having trouble with the glenoid tear. Further, Sartin stated that he continues to have some pain in his shoulder after pitching baseball games.
On the issue of mental pain and suffering, Sartin mentioned the fact that he no longer feels "whole" several times during the course of his testimony. He also noted that he is much more insecure about his abilities and about what the future holds that he was prior to the accident. Additionally, he testified to being embarrassed about the scar on his back, which he claims causes him to curtail such activities as swimming.
The only evidence of residual physical disability is Sartin's testimony that he continued at the time of trial to have pain in his shoulder after pitching a baseball game. He claimed that it would take him two or three weeks to recover from a game, whereas it would previously take him three or four days to do so.
Although Sartin did mention at the beginning of his testimony that he had hoped to become a professional baseball player, the record contains no other evidence that Sartin suffered any loss of enjoyment of life as a result of the accident. In fact, Sartin's testimony indicates that he continues to participate in various athletic activities.

2. Quantum arguments

The defendants' major argument that the award made to Sartin was excessive is their *454 claim that the shoulder injury was not caused by the accident, but by a pitching incident five months after the accident, about the time the injury was diagnosed. Even if the shoulder injury was caused by the accident, the defendants say, the injury was successfully repaired by outpatient arthroscopic procedure and did not require further medical attention from February 19, 1987 through the date of the trial. Thus, Sartin was fully healed within 10 months of the accident, the defendants point out.
On the other hand, Sartin claims that he had problems with his shoulder from the time of the accident, although he admits that no medical report was made until five months after the accident. Additionally, he claims that he suffered lasting physical problems, as well as anguish and mental torture, as a result of the accident.

4. Sartin's award

Considering all of the above evidence and arguments, this court finds that the $450,000 award to Sartin is not reasonably supported by the record in the case, and that the trial court therefore abused its much discretion in setting the award. The only evidence of special damages presented in this case was $5,728.10 in past medical expenses. Further, we note that Sartin's injuries were relatively insignificant. Accordingly, we have determined that a lump sum award of $150,000 is the highest amount the judge could reasonably have awarded Sartin. The trial court's $450,000 award to Sartin is therefore reduced to $150,000, subject to a credit of $6,320.54 in medical expenses previously paid by the State.

D. Mark Abadie

Mark Abadie, who was a third baseman for the Delgado baseball team, was awarded a lump sum award of $374,839.50 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Abadie's injuries, viewed in the light most favorable to Abadie, is summarized below.
Abadie stated at trial that he did not remember where he was seated in the van or any of the other details leading up to the accident. He said that he first knew something was wrong because of the looks on the faces of the other van passengers. His next memory is being in an ambulance with Clement.
Craig Ledet, a Delgado baseball team member who was travelling in a station wagon and came on the scene within five minutes of the accident, testified that Abadie was lying behind the back of the van when they arrived. Ledet said that Abadie was covered with blood, and that he mentioned his neck was bothering him. Additionally, Abadie was in a lot of pain, Ledet opined.
1. Damages
a. Special damages
(1) Past medical expenses
Abadie was taken by ambulance to the emergency room at Northshore Regional Medical Center, where he was treated by Robert E. Owens, a specialist in ear, nose, throat, head, and neck surgery. Dr. Owens testified that he was consulted because Abadie had numerous facial lacerations, a neck laceration, and a laceration of the left ear. At trial, Dr. Owens described eight separate lacerations, including lacerations on the right brow, between the brows, on the right cheek bone, on the left mid-forehead, on the left chin, across the jawbone, on the left upper neck, of the left ear, and behind the left ear. The most severe of the lacerations was a "simple transverse laceration of the angle of the left mandible," which is the jawbone. That laceration, Dr. Owens stated, penetrated the full thickness of the skin, exposing the jawbone.
Dr. Owens repaired the lacerations under local anesthesia in the Northshore emergency room. Such repairs would normally be made in the operating room, Dr. Owens stated, but were done in the emergency room in this case because Abadie had suffered a neck injury which made the doctors concerned about moving him around. Additionally, Abadie had suffered a chest bruise, which caused the doctors concern about putting him under any form of general anesthesia. Most of the lacerations were easily repaired, he *455 stated, since they required only that he "match up" the lines. However, the laceration of the jawbone was more problematic because it had a lot of jagged edges. That laceration had to be trimmed to a straight line and the skin closed with nylon sutures.
On April 28, 1986, Abadie was transferred to Southern Baptist Hospital, where he was initially treated by Dr. Joseph P. Licciardi, an orthopedic surgeon. Dr. Licciardi testified that he reviewed Abadie's x-rays and found that one of the vertebra in his neck had been fractured; as a result, the vertebra was crushed and protruding toward the nerve in the spinal canal. However, Dr. Licciardi stated that he found no neurological problems during his examination of Abadie on April 28, 1986; saying that he did not feel that Abadie had any "major medical problems." Nevertheless, because of the nature of the neck injury, Dr. Licciardi said that he felt unqualified to deal with it, and referred Abadie to a neurosurgeon, Dr. Carlos Pisarello, for further treatment. Dr. Licciardi testified that Abadie was hospitalized at Southern Baptist for three days, during which time he was given medication and fitted with a neck brace.
Dr. Pisarello stated that Abadie suffered a comminuted fracture of the sixth vertebra, which is located in the lower portion of the neck. A comminuted fracture occurs when one piece of bone is reduced to a collection of small fragments, Dr. Pisarello said. Abadie's CAT scans and MRI's showed a fissure in the middle of the vertebra with one bit of fragment displaced backwards and to the side; the spinal cord had not been injured, Dr. Pisarello said. Therefore, Abadie did not undergo surgery, which would have been "pretty risky"; his neck was immobilized with a collar, which allowed the fracture to fuse by itself, Dr. Pisarello said.
Abadie was forced to wear the collar 24 hours a day for several months, which caused him to suffer some skin infections. On May 29, 1986, he had developed an infected cyst in the lymph mode on one side of his jaw. The brace was removed on July 15. Then, on October 13, Abadie was released to participate in a full range of activities. Abadie did consult Dr. Pisarello two additional times, complaining of discomfort in the neck when he works at a desk for long periods of time.
Abadie was also treated for a cyst on the scar behind his ear by Dr. William P. Beatrice, who performed an excisional biopsy in the emergency room of Southern Baptist on June 19, 1987. The development of such cysts is fairly common on scars behind the ear, Dr. Licciardo testified.
Abadie presented evidence of the following past medical expenses:

 Northshore Regional Medical
 Center $5,466.30
 Southern Baptist Hospital 1,501.20
 117.00
 373.00
 602.00
 J. Carlos Pisarello, M.D. 580.00
 Robert E. Owens, M.D. 930.00
 Joseph P. Licciardi, M.D. 270.00
 ________
 TOTAL $9,839.50

(2) Future medical expenses

Dr. Pisarello testified that because of the nature of Abadie's neck injury, he would probably be forced to undergo one of two types of surgery at some point in the future, probably after he reaches the age of 40. Most likely, Dr. Pisarello said, Abadie would need a discectomy, which would cost approximately $15,000. However, a spinal cord fusion, which would cost approximately $30,000, is also a possibility.
Additionally, Dr. Owens stated that Abadie might decide sometime in the future to undergo a procedure to further repair the damage caused by the laceration to the jawbone, which resulted in a noticeable scar. Such a procedure would be outpatient surgery, at a cost of $500 to $600.
No evidence of lost earnings were presented by Abadie.

b. General damages

The record in this case contains very little discussion of physical pain and suffering, other than the testimony that Abadie experienced discomfort while having to wear the neck brace and that he continues to experience discomfort in the neck if he works at a desk for a long period of time. Ledet did testify that Abadie was in a lot of pain when *456 he arrived on the scene. The only evidence of any mental pain and suffering is Abadie's testimony that he was "very scared" for a while that he was going to be paralyzed because of the neck injury. Both Abadie's testimony and the surveillance films shown by the defendants in this case indicate that Abadie has no residual physical limitations. The record does, however, contain evidence of permanent facial scarring caused by the laceration to the jawbone.

2. Quantum arguments

The defendants based their claim that Abadie's award is excessive on their contention he presented no evidence of present disability at the trial, saying he "can do just about anything," citing Abadie's own testimony, as well as a surveillance video showing him engaging in numerous physical activities. They argue that Abadie had returned to full activity in school and in the playing field by the time of trial. Further, they claim that he has no functional limitation of the neck and that he has always remained 100 percent neurologically intact.
Abadie negates the defendants' contention that he has no present disability, saying that he constantly suffers from stiffness in the neck. More important, he claims, is the fact that he has extensive, unsightly facial scarring. Abadie also contends that he suffered both physically and mentally from concern that he would be paralyzed because of his spinal injury. Additionally, he claims that he suffers continuing mental anguish from memories of the accident. Further, he asserts that the inevitability of eventual surgery clouds his future.

4. Abadie's award

Considering all of the above evidence and arguments, this court finds that the $374,839.50 award to Abadie is not reasonably supported by the record in the case; therefore, the trial court abused its much discretion in setting the award. Accordingly, we have determined that the following amounts are the highest the judge could reasonably have awarded Abadie for his various items of injury:

 Past medical expenses $ 9,839.50
 Future medical expenses 25,000.00[12]
 General damages 200,000.00
 __________
 TOTAL $234,839.50

Accordingly, the trial court award to Abadie is hereby reduced from $374,839.50 to $234,839.50. This amount is subject to a credit of $11,499.65 for medical expenses previously paid by the state.

E. Douglas Faust

Douglas Faust, who was a second baseman for the Delgado baseball team, was awarded a lump sum award of $85,276.75 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Faust's injuries, viewed in the light most favorable to Faust, is summarized below.
When the accident occurred, Faust was seated on the far left side of the back seat of the van, talking to the two players seated beside him. He testified that he heard a loud boom, and that he became very confused and scared when the van started flipping. When the flipping stopped, he was down on his left shoulder and on the left side of his head; the two players who had been sitting beside him were on top of him. All three of them climbed out the back door. When he saw some of the other players outside the van, Faust fainted.
Ledet testified that Faust was seated on the median of the interstate, conscious, when he arrived in the station wagon about five minutes after the accident. Ledet saw a cut on Faust's head. Additionally, Faust told him that his shoulder hurt. Ledet stated that Faust appeared to be in pain.
1. Damages
a. Special damages
Faust was taken by ambulance to the Slidell Memorial Hospital emergency room, *457 where he told Dr. Earl Gravois that he had landed on his head and he complained of pain in both shoulders. Additionally, Dr. Gravois found a bruise on Faust's left shoulder blade. Dr. Gravois stated that Faust also suffered lacerations, abrasions, and contusions; the lacerations had been cleaned, debrided and sutured under a local anesthesia in the emergency room.
The physical examination conducted by Dr. Gravois confirmed that Faust experienced pain when he elevated his arm. Dr. Gravois stated in testimony by way of video deposition that he also found a "suggestion" of subluxation of the left shoulder. Dr. Gravois called in an orthopedist to look at Faust's shoulder; however, the orthopedist did not testify at trial. Dr. Gravois ordered chest x-rays, which showed a density in Faust's upper left lung, which turned out not to be significant. Because of the nature of the accident, Dr. Gravois admitted Faust to the hospital overnight for observation. During that time, he received intravenous infusions. He was discharged the next day; he was wearing a left-arm sling when he left the hospital.
Thereafter, on September 12, 1986, Faust consulted Dr. Terry Habig, an orthopedic surgeon, concerning his continuing left shoulder pain. Dr. Habig testified that his physical examination suggested a weakness in the rotator cuff, and a possible subluxation (looseness) of the shoulder. On November 4, 1986, Dr. Habig performed arthroscopic surgery at Southern Baptist Hospital. The procedure, which was performed under general anesthesia, was designed to look into Faust's shoulder at the tendons and ligaments. Dr. Habig found a small fragment on the under side of Faust's left shoulder rotator cuff, indicating a small area of partial tearing, which was abnormal. Additionally, he found some tearing of the front portion of the ligament attached to the front of Faust's left shoulder. Both of these findings, Dr. Habig stated, were consistent with a shoulder instability. Dr. Habig shaved the affected areas in an effort to increase the blood supply and allow the problems to heal on their own. The sutures were removed on November 11, 1986, and Faust was sent for range of motion therapy and strengthening exercises. Faust was released to play baseball on December 31, 1986. Dr. Habig saw Faust at least three additional times; each time Faust complained of continuing pain in the left shoulder.
Faust presented evidence of the following past medical expenses:

 Dr. Earl Gravois $ 110.00
 Southern Baptist Hospital 1,908.60
 156.90
 Dr. Terry Habig 1,836.00
 ________
 TOTAL $4,011.50

Regarding future medical expenses, Dr. Habig testified that he had recommended a surgical stabilizing procedure to tighten the ligaments in the front of the shoulder and thereby prevent the slippage Faust is experiencing. Dr. Habig indicated that the procedure, which would be performed under general anesthesia, would cost some $15,000 and would probably result in the loss of 10 to 15 degrees external rotation of the shoulder. The total recovery period from the procedure would be approximately three months. However, Dr. Habig's testimony, as well as Faust's testimony, indicates that Faust wishes to postpone the surgery as long as possible so that he can continue to participate in coaching activities.
The record contains no evidence of any lost wages.

b. General damages

Both Faust and his mother, Madeline Faust, testified to the fact that Faust has experienced considerable physical pain in the left shoulder daily since the accident. This pain is sometimes aggravated by Faust's activities, such as playing and coaching baseball. Faust also testified to his mental suffering because of the fear and confusion which occurred at the time of the accident. In terms of residual disability, Faust stated that he has problems doing anything which requires him to raise his arms over his head. Additionally, he said that he is unable to sleep on his left side or to lay on his stomach and watch television.

*458 2. Faust's cross-appeal

Because Faust filed an answer to the appeal, alleging that the trial court award is insufficient to compensate him for his injuries, we must also examine the record in the light most favorable to the defendants in order to determine whether the award should be increased. In that regard, the defendants presented the deposition testimony of a Dr. Finney, who gave Faust a pre-season physical in August of 1988. Dr. Finney stated that although Faust stated that he had had shoulder problems in the past, he reported that he was not experiencing any shoulder problems at the time of the physical. Additionally, the physical examination of the left shoulder, which included tests for impingement and for instability of the shoulder, revealed no problems. Dr. Finney stated that he specifically tested the shoulder for laxity "which might become symptomatic," but that he noted a completely normal physical examination of the left shoulder. However, Dr. Finney admitted on cross-examination from Faust's attorney that a partial labrum tear could be asymptomatic on a given day. Further, he stated that he would defer to Dr. Habig's findings.
The defendants also showed video surveillance films, featuring Faust engaged in normal activities which included playing and coaching baseball, and carrying objects while preparing the baseball field for play. Finally, the defendants presented photographs showing Faust playing baseball; the photographs had been featured in newspaper stories.

3. Evidentiary issues

The defendants also contest the trial court's refusal to allow them to ask questions concerning Faust's use of Advil to control the pain and to submit a prior writing in which Faust omitted any reference to his alleged use of Advil, which were designed to impeach Faust's testimony that he uses Advil everyday to control pain. However, as noted earlier, a trial judge has great discretion to control the examination of witnesses and the introduction of evidence. We find no reversible error in the trial court's decision on this issue.

4. Quantum arguments

The defendants attack the award to Faust by arguing that Faust failed to prove that the shoulder injury was caused by the accident in question, since it was first diagnosed five months after the accident. Since Faust restarted playing baseball only eight days after the accident and he was active during the five-month period in question, the appellants suggest that the injury could have been caused by something other than the accident. This argument is supported by the fact that medical examinations shortly after the accident revealed no shoulder injury, the defendants argue. Finally, the defendants point to the video surveillance tapes, which show Faust engaged in a number of activities without any apparent problem with his shoulder.
Faust claims, however, that immediately after the accident, he was lying on the floor with all of his weight on his shoulder, with two other players on top of him. He claims that he was unable to move the arm immediately after the accident and points out that he went home after his overnight stay in the hospital with his arm in a sling. He argues that the shoulder caused him daily pain from the time of the accident, and that it still caused him pain and limited his activities at the time of trial, five years after the accident. Additionally, that x-rays taken immediately after the accident showed that the shoulder was fractured, Faust asserts. Further, his only alternative to enduring the pain is to undergo reconstructive surgery, which would result in limitations in his range of motion, he says.

5. Faust's award

Considering the above evidence and arguments, this court finds that the $85,276.75 award to Faust made by the trial court is reasonably supported by the record; thus, the trial court did not abuse its much discretion in setting the award. The record reveals the following special damages:

 Past medical expenses $ 4,011.50
 Future medical expenses 15,000.00
 _________
 TOTAL $19,011.50

Once the above special damages are subtracted from the $85,276.75 award, $66,265.25 *459 remains as general damages. Although the record reveals that the question of whether the shoulder injury was caused by the accident was seriously contested at trial, the judge chose to credit the evidence presented by Faust. The record supports this award. Therefore, the $85,276.75 award is affirmed, subject to a credit for $6,579.75 in medical expenses previously paid by the State.

F. Patrick Prigmore

Patrick Prigmore, who was a catcher for the Delgado baseball team, was awarded $76,673.08 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Prigmore's injuries, viewed in the light most favorable to Prigmore, is summarized below.
Prigmore was riding in the front passenger seat of the van at the time of the accident. He testified that he had been dozing off and on between talking to Griffin and that he had apparently dozed off for a second when he heard the explosion of the tire blowout. He remembered leaning to the left, toward the driver, because he knew the van was going to flip and he didn't want to be thrown out the side window, which was open. After the first flip, he doesn't remember anything; he testified that he apparently passed out at that time.
When Ledet arrived in the station wagon, he saw Prigmore lying on the median on the right side of the van, holding his stomach. Ledet testified that Prigmore appeared to be in pain. Prigmore said that he remembered only "bits and pieces" until he woke up in hospital in pain, unable to talk.
1. Damages
a. Special damages
Prigmore was taken by ambulance to Northshore Regional Medical Center, where he complained to Dr. Cary Gray about pain in his left chest. Dr. Gray stated that Prigmore was initially stable, although he was experiencing shortness of breath. However, during the course of tests administered to determine whether Prigmore had suffered a ruptured diaphragm, Prigmore's condition deteriorated to an emergency situation. Therefore, he was rushed to the operating room, where Dr. Gray performed exploratory surgery and discovered that Prigmore had indeed suffered a ruptured diaphragm. As a result, Prigmore's colon, spleen, small bowel, and stomach were in his chest area, compressing the lung and causing respiratory problems. Dr. Gray pulled the organs back into Prigmore's abdomen, then repaired the rupture in the diaphragm, which was some eight inches long. Additionally, Dr. Gray repaired a tear in Prigmore's spleen, as well as a tear in his phrenic vein. During the course of the accident and the surgery, Prigmore lost three to four pints of blood, Dr. Gray stated. Dr. Gray stated that Prigmore was in a life-threatening situation, with very painful injuries.
Prigmore also suffered a pulmonary contusion (bruise), which interfered with the function of his lungs. Therefore, he was placed on a ventilator for two days, which required that the doctors insert a 1½-inch tube through his mouth into his throat. Besides the ventilator tube, Prigmore had a nasal-gastric tube inserted through his nose into his stomach, as well as two drainage tubes in his left side.
Prigmore was released from the hospital on May 1, 1986. He consulted Dr. Gray for follow-up and was released to return to normal activities on June 10, 1986. At that time, Dr. Gray said, Prigmore was asymptomatic. Dr. Gray said that Prigmore's prognosis was excellent, and that he did not expect any long-term disability.
Prigmore presented evidence of following past medical expenses:

 Northshore Regional Medical
 Center $18,548.08
 Dr. Cary Gray 3,125.00
 _________
 TOTAL $21,673.08

The record in this case contains no evidence of future medical expenses or lost earnings.
b. General damages
Both Prigmore himself and Dr. Gray testified that the injuries Prigmore suffered were physically painful. Dr. Gray said that the injuries suffered by Prigmore were initially life-threatening and very painful. Prigmore testified to experiencing pain and discomfort *460 after he woke up in the hospital because of the tubes inserted in his body. Additionally, he said that it was painful when the ventilator would pump an extra breath of air into his body. He said that he felt pain when the chest tube was removed. Additionally, he felt pain when he moved in a certain way throughout the summer of 1986. Finally, he testified to pain when he tried to return to playing baseball.
The record contains no evidence of mental pain and suffering, or of residual physical disability.

2. Prigmore's cross-appeal

Because Prigmore filed an answer to the appeal, alleging that the trial court award is insufficient to compensate him for his injuries, we must also examine the record in the light most favorable to the defendants in order to determine whether the award should be increased. The evidence most favorable to the defendants presented was questions concerning various jobs held by Prigmore subsequent to the accident. Prigmore admitted, on cross examination from one of the defendants' attorneys, that he had held jobs as a weight room attendant, a bar bouncer, a weight instructor, a roofer, and a construction laborer after the accident. Additionally, Prigmore said that he was able to play softball and racquetball, as well as baseball, after the accident. In addition, he admitted that he jogs and waterskis. The defendants also presented a video surveillance tape showing Prigmore playing baseball with no apparent disability after the accident.

3. Quantum arguments

The defendants argue simply that Prigmore's award is excessive because all of Prigmore's injuries had resolved within six months of the accident, and because his history since the accident, as discussed above, indicates that he suffers no lasting effects.
Prigmore paints a very different picture of his injuries, pointing out that his internal injuries resulted in a serious, life-threatening situation and that he is alive today only because of an extensive, complicated surgical procedure which resulted in an unsightly scar which extends from his chest to below his navel. He claims that he suffered severe weight loss and that the accident severely limited his physical activities for life.

4. Prigmore's award

Considering the above evidence and arguments, this court finds that the $76,673.08 award to Prigmore made by the trial court is not reasonably supported by the record; thus, the trial court abused its much discretion in setting the award. The record reveals special damages consisting of $21,673.08 in past medical expenses. Once that amount is subtracted from the $76,673.08 award, $55,000 remains as general damages. The record reveals that this award is unreasonably low to compensate Prigmore for his general damages and that the lowest award the judge could reasonably have given for general damages is $100,000. Therefore, the $76,673.08 award is raised to $121,673.08, subject to a credit for $23,092.49 in medical expenses previously paid by the State.

G. Henry Gaspard

Henry Gaspard was awarded a lump sum award of $55,000 by the trial judge as compensation for the injuries he suffered as a result of the accident. The evidence of Gaspard's injuries, viewed in the light most favorable to Gaspard, is summarized below.
When the accident occurred, Gaspard was seated "directly in the middle of the van." He stated at trial that he heard a booming sound, that he got nervous and panicky, and that the van started flipping. He said that he hit every area of his body on the van during the time it was flipping. Once the van came to a stop, he helped Sartin out of the van, then collapsed on the ground beside him.
1. Damages
a. Special damages
Gaspard was taken to Slidell Memorial Hospital, where he was initially examined by Dr. Gravoir, who admitted him for observation for a possible major trauma. While he was in the hospital, Dr. Gravois consulted Dr. Jord Sanchez, an orthopedist, to examine a *461 knee injury and a possible injury to Gaspard's neck. Dr. Sanchez noted mild swelling in the front part of Gaspard's right knee, as well as a superficial abrasion on his thigh.
The day after the accident, Gaspard experienced spiking temperatures and a productive cough, according to the hospital records. As a result, the medical personnel initiated respiratory therapy, and required Gaspard to use a "breathilizer," which is a device to encourage him to breathe deeply, thereby clearing up the lung problem.
Gaspard was released from the hospital on April 29, 1986. After he went home, he continued using the breathilizer during the two- to three-week period he spent convalescing. During the period of convalescence, he continued to experience headaches, neck pain, back pain, problems with his breathing, and high temperatures, according to testimony given by his mother, Patricia Gaspard.
Subsequently, Gaspard consulted with Dr. Daniel Seltzer, who specializes in orthopedic surgery. Dr. Seltzer testified by video deposition that he treated Gaspard for low back and neck pain from August 27, 1986, until June 17, 1987. During that time, Dr. Sanchez diagnosed Gaspard as suffering with soft-tissue injuries of the neck and lower back. Dr. Sanchez prescribed muscle relaxants, as well as heat therapy, and told Gaspard to limit his physical activities. The x-rays taken during this period showed a normal lumbar spine. When Gaspard continued to complain of back pain, despite the fact that Dr. Sanchez had found no significant position findings, Dr. Sanchez suggested that Gaspard consider submitting to further diagnostic tests, such as an MRI and/or CAT scan. Gaspard never had those tests performed. Dr. Sanchez never really released Gaspard from treatment; he just quit coming to see him. Gaspard said he discontinued treatment because he started feeling better.
Gaspard presented the following list of past medical expenses:

 Slidell Memorial Hospital $2,786.45
 Daniel Seltzer, M.D. 270.00
 Medical Center Laboratory 141.00
 Jord J. Sanchez, M.D. 75.00
 Mahorner Clinic
 Earl Gravois, M.D. 170.00
 Jim Dowling, M.D. $ 29.00
 _________
 TOTAL $3,471.45

The record contains no evidence of future medical expenses or lost wages. Gaspard did however testify that he lost several months of his academic career since he was unable to complete his examinations during the Spring semester of 1986.

b. General damages

Both Gaspard and his mother testified that he experienced considerable pain during his convalescence period, as well as some pain for a significant period of time after that, possibly as long as a year. There is no testimony concerning mental pain and suffering or residual disability. In fact, Gaspard testified that he experienced no problems during training for the Persian Gulf crisis when he was called up for active duty as a member of the National Guard.

2. Gaspard's cross-appeal

Because Gaspard filed an answer to the appeal, alleging that the trial court award is insufficient to compensate him for his injuries, we must also examine the record in the light most favorable to the defendants in order to determine whether the award should be increased. The most important evidence presented by the defendant was evidence that Gaspard told the nurse that he had been suffering from a cold for a week prior to the accident. The defendants allege that Gaspard's respiratory difficulties, including the spiking temperatures, could as easily have been caused by the pre-existing condition as by the accident.

3. Quantum arguments

In contesting the quantum award in this case, the appellants again rely on the arguments that all of Gaspard's complaints were resolved in a short period of time, that he resumed his college baseball career quickly, and that he would require no future medical care. Additionally, they claim, he suffered no loss of earning capacity.
Gaspard, on the other hand, claims that he had serious difficulties because of an "acute pulmonary problem." He claims that his *462 award should be increased because he is entitled to some recovery for the fact that he was unable to take his final examinations in 1986 and thus lost four to five months of his academic career.

4. Gaspard's award

Considering the above evidence and arguments, this court finds that the $55,000 award to Gaspard made by the trial court is reasonably supported by the record; thus, the trial court did not abuse its much discretion in setting the award. The record reveals special damages consisting of $3,471.45 in past medical expenses. Once that amount is subtracted from the $55,000 award, $51,528.55 remains as general damages. The record supports this award. Therefore, the $55,000 award is affirmed, subject to a credit for $3,195.96 in medical expenses previously paid by the State.

H. Kevin Reynolds

Kevin Reynolds, who was a catcher for the Delgado baseball team, was awarded a lump sum award of $35,000 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Reynold's damages, viewed in the light most favorable to Reynolds, is summarized below.
Reynolds testified that he was seated directly over the tire when it blew. When the accident occurred, Reynolds said, the entire right side of his body was thrown against a protruding metal object on the right side of the van. When the van came to a stop, Reynolds crawled out the back door.
1. Damages
a. Special damages
Reynolds was transported to Slidell Memorial Hospital, where he was kept overnight so that the doctors could monitor his heart because of suspected enzyme bleeding caused by a blow to his chest. The next morning, Dr. Jord Sanchez, responding to complaints from Reynolds concerning pain in his right thumb, x-rayed the thumb, then placed Reynolds in a short arm cast.
Reynolds was sent home, where he convalesced for three or four days. On April 28, 1986 Reynolds resumed physical therapy treatments with Edwin Porsche, who had been treating him for a pre-existing shoulder injury since April 4, 1986. Porsche had begun the 20-treatment therapy, which had been prescribed by Dr. Melvyn L. Parnell Jr., on April 15, 1986. Porsche continued to treat Reynolds in compliance with that program until June 10, 1986. Porsche testified that he saw Reynolds twelve times between the date of the accident on April 25, 1986 and the date of completion of the physical therapy program on June 10, 1986. When the program was completed on June 10, 1986, Porsche conducted objective tests which indicated that Reynolds' right shoulder was at least as strong as his left shoulder, he testified.
However, Reynolds continued to have problems with his right shoulder. Dr. Parnell, who saw Reynolds in the two weeks immediately prior to the accident and numerous times after the accident over a 4½- to five-year period, testified that the accident aggravated Reynolds' pre-existing shoulder problems. Dr. Parnell had first seen Reynolds on April 14, 1986, when he made a tentative diagnosis that Reynolds had suffered either a rotator cuff tear or a cartilage tear in his right shoulder. He prescribed the physical therapy program at that time. He next saw Reynolds on April 21, 1986, when he felt that Reynolds had improved to the point that he could participate in the April 25, 1986 baseball game as a designated pitcher.
Following the accident, Dr. Parnell saw Reynolds on May 7, 1986, when he removed the short-arm cast which had been applied at the hospital, then applied a new cast when he found continued instability in Reynolds' right thumb. At that time, he also found that Reynolds had a bruised collar bone and discomfort with palpation in the tendons over the rotator cuff in the right shoulder. He recommended rest for the shoulder injury. On May 21, 1986, Dr. Parnell found that Reynolds' rotator cuff tendonitis had improved. He removed the cast on June 4, 1986.
*463 Dr. Parnell initially agreed with Porsche's opinion that Reynolds' shoulder problems had resolved themselves by early June 1986, as evidenced by the fact that he discharged Reynolds on June 11, 1986, one day after Porsche completed the physical therapy program. However, when Reynolds returned to him with further complaints, Dr. Parnell resumed treatment. Dr. Parnell continued to believe that Reynolds might have suffered a torn rotator cuff, but was unable to confirm that tentative diagnosis because of problems encountered when he ordered an arthrogram and when he ordered an MRI. Dr. Parnell stated unequivocally in his video deposition that Reynolds suffers a functional impairment of the right shoulder which has made him unsuccessful in all his attempts to return to sporting activities.
On cross-examination, Dr. Parnell stated that his diagnostic impression on June 11, 1986 that Reynolds' right shoulder problems had been resolved was incorrect because Reynolds had not returned to his physical activities enough that the problems had manifested themselves. Moreover, he repeatedly stated his belief that Reynolds' problems were indeed related to the accident. This opinion was based on two things: (1) the fact that Reynolds injury had been improving prior to the accident, and (2) the fact that Reynolds had suffered injury to both his right thumb and right collar bone in the accident. Concerning the second fact, Dr. Parnell said that a person who suffers injury to both the collar bone and the thumb on one side would almost always also suffer injury to the shoulder.
Reynolds also consulted Dr. Swan S. Ward, a specialist in internal medicine, who had been his doctor since November 17, 1983. Dr. Ward examined Reynolds relative to the accident on August 5, 1986, when Reynolds' primary complaint was trauma to the chest wall, including the collar bone. Dr. Ward felt that Reynolds had hit both the front and back region of the rotator cuff of his right shoulder while the van was flipping. Dr. Ward also found some inflammation of the cartilage which joins the rib to the breast bone and some inflammation of the intercoastal nerves between the ribs, all secondary to trauma. Dr. Ward performed an EKG and an enzyme study to confirm his diagnosis and to rule out any internal injuries; both tests were normal. Thus, Dr. Ward felt that Reynolds essentially suffered a bruise to his chest area, which irritated the sensory nerve endings. He discharged Reynolds on August 19, 1986, when Reynolds' clinical findings were markedly improved and he was asymptomatic. He felt the problem with Reynolds' chest was probably related to the accident.
Reynolds presented the following list of past medical expenses:

 Slidell Memorial Hospital $1,779.60
 Melvyn L. Parnell Jr., M.D. 720.00
 Swan S. Ward, M.D. 251.00
 Edwin Porsche, P.T. 700.00
 East Jefferson Hospital 1,131.00
 _________
 TOTAL $4,781.60

Concerning possible future medical treatment, Dr. Parnell stated that the only option available to diagnose the continuing right shoulder program was diagnostic arthroscopic surgery. Reynolds did not wish to have surgery at the time of trial, saying he considered surgery a last resort. There was no evidence of lost wages.

b. General damages

Although the record in this case has very little evidence concerning pain suffered by Reynolds as a direct result of the accident, Reynolds did testify that his shoulder bothered him when he tried to return to baseball. Additionally, both Reynolds and his mother testified to the limitations he suffered during the period he was forced to wear the cast on his right arm. Concerning mental pain and suffering, Reynolds said the accident scene was very frightening immediately after the accident, since they were so close to the interstate and cars were "whizzing" by. Reynolds also indicated that he had suffered because he was no longer able to play baseball, which he loved to play. Of course, the record contains evidence of continued disability caused by the continuing problems with Reynolds' right shoulder, which had not been definitely diagnosed at the time of trial.

*464 2. Reynolds' cross-appeal

Because Reynolds filed an answer to the appeal, alleging that the trial court award is insufficient to compensate him for his injuries, we must also examine the record in the light most favorable to the defendants in order to determine whether the award should be increased. Of course, the evidence most favorable to the defendants in this appeal is the evidence that Reynolds was having problems with his left shoulder before the accident ever occurred. Unquestionably, Reynolds consulted Porsche concerning the problems with his shoulder on April 4; he then consulted Dr. Parnell on April 14. A problem with the shoulder, which had prevented Reynolds from playing ball for at least two weeks, had been definitively diagnosed. The defendants claim that Reynolds therefore failed to carry his burden of proving that the shoulder problem was causally related to the accident.

3. Evidentiary issues

The defendants challenge the trial court's decision prohibiting them from introducing a surveillance tape which they claim impeached Reynolds' testimony that he was unable to play strenuous baseball games "with the boys." Reynolds claims the videotape was properly excluded because it was not offered in accordance with the pre-trial orders in the case. We find no reversible error in the trial court's action on this issue.
Additionally, Reynolds claims that the trial judge failed to properly instruct the jury concerning aggravation of a pre-existing injury. However, we find that the jury instructions, taken as a whole, were sufficient to apprise the jury of the applicable law. Thus, Reynolds' arguments on this issue are without merit.

4. Quantum arguments

Predictably, the defendants devote much of their briefs to discussion of the questionable nature of the injury to Reynolds' right shoulder, claiming the problem was diagnosed 11 days prior to the accident. Additionally, they claim that Reynolds suffers no residual disability, demonstrated by his return to normal physical activities.
Reynolds, on the other hand, claims that he was forced to undergo extensive medical treatment in the hospital, including treatment for enzyme bleeding around his heart and treatment by an opthamologist. Additionally, he points out that the fractured thumb required that he wear two different casts, which severely restricted his activities for two months following the accident. He alleges also that the problems with his shoulder continued up to the date of the trial.

5. Reynolds' award

Considering the above evidence and arguments, this court finds that the $35,000 award to Reynolds made by the trial court is not reasonably supported by the record; thus, the trial court abused its much discretion in setting the award. The record reveals special damages consisting of $4,781.60 in past medical expenses. Once that amount is subtracted from the $35,000 award, $30,218.40 remains as general damages. The record reveals that this general damage award is unreasonably low to compensate Reynolds for his general damages and that the lowest amount the judge could reasonably have given for general damages is $50,000. Therefore, the $35,000 award is raised to $54,781.60, subject to a credit for $3,240.60 in medical expenses previously paid by the State.

I. Paul Ayo, Jr.

Paul Ayo, Jr., who was a pitcher for the Delgado baseball team, was awarded a lump sum award of $25,590 by the trial court as compensation for the injuries he suffered as a result of the accident. The evidence of Ayo's injuries, viewed in the light most favorable to Ayo, is summarized below.
Ayo was seated in the back seat of the van to the far right side, reading a magazine, when the tire underneath him blew out, he stated. He grabbed the seat in front of him, and was in the back seat or the seat in front of the back seat, facing the back of the van, when the van came to a rest. He climbed out the back window, clear of the van, and sat down on the median.
*465 1. Damages
a. Special damages
Ayo was taken to Northshore Regional Medical Center, where he stated that he was checked by a doctor, then sent for x-rays. Additionally, the hospital personnel performed what Dr. Bryan Bertucci identified as a intravenous pylogram (I.V.P.) to check for injury to Ayo's kidneys. After cleaning his abrasions, the hospital sent him home.
The next day, Ayo consulted Dr. Bertucci, who performed both a physical examination and a musculoskeletal examination. Dr. Bertucci stated that the physical examination showed several abrasions, as well as an "extremely large" hemotoma to the left flank, an injury to the right index finger, and a small cut on the left cheek. The musculoskeletal examination showed tenderness in the upper neck and in the upper trapezial area. However, Ayo had a full range of motion and his muscle strength was intact. Dr. Bertucci felt that most of Ayo's discomfort was secondary to abrasions, lacerations, and contusions.
Dr. Bertucci also performed a urinanalysis to rule out injury to the kidneys. Although the urinanalysis was negative on April 25, 1986, subsequent tests showed some red blood cells in the urine. Because the problem did not become serious, and because the presence of a large bruise on Ayo's back, Dr. Bertucci eventually diagnosed a renal contusion (bruise).
Dr. Bertucci saw Ayo two times in May of 1987; each time Ayo reported improvement, which was verified by Dr. Bertucci's physical examinations. Dr. Bertucci released him to return to all of his normal activities on May 14. Ayo was told at that time that he could do anything he choose to do, including pitching, but he was also warned that using an injured area of the body would result in a longer period required for healing. Ayo presented evidence of some $1,600 worth of past medical expenses.[13]
The record contains no evidence of future medical expenses. Further, Ayo testified that he experienced no loss of earnings.

b. General damages

Ayo testified that immediately after the accident, he experienced soreness and stiffness in his back and neck. Additionally, the abrasions caused by the accident made him uncomfortable. Further, Ayo experienced pain in his right shoulder for some six months following the accident, he said. The only mental pain and suffering mentioned at trial was a fear of riding in vans, especially on the interstate and especially if someone else was driving. Ayo testified that he had no residual physical pain or disability at the time of trial.

2. Quantum arguments

In arguing that Ayo's award was excessive, the defendants focus on the relatively minor nature of Ayo's physical injuries. Additionally, they claim that his longest-lasting problem, with his shoulder, would have been resolved more quickly if he had simply refrained from playing baseball a little longer.
Ayo, however, claims that he suffered severe psychological injuries in addition to his physical injuries, which themselves were more severe than the appellants indicate.

4. Ayo's award

Considering the above evidence and arguments, this court finds that the $25,590 award to Ayo made by the trial court is reasonably supported by the record; thus, the trial court did not abuse its much discretion in setting the award. The record reveals special damages consisting of $16,000 in past medical expenses. Once that amount is subtracted from the $25,590 award, $23,990 remains as general damages. The record supports this award. Therefore, the $25,590 award is affirmed, subject to a credit for $1,564.45 in medical expenses previously paid by the State.

J. Conclusion on damage issues

Accordingly, the trial court judgment in favor of Mickey Maitre is reduced from $2,002,717.75 to $1,660,576.75; the trial court judgment in favor of Alton Sartin is reduced from $450,000 to $150,000; and the trial *466 court judgment in favor of Mark Abadie is reduced from $374,839.50 to 234,839.50. Further, the trial court judgment in favor of Patrick Prigmore is raised from $76,673.08 to $121,673.08, and the trial court judgment in favor of Kevin Reynolds is raised from $35,000 to $54,781.60. All other trial court judgments on damages are affirmed.

V. CONCLUSION

Accordingly, the trial court judgment against Goodyear is reversed, while the judgment against Delgado/State is affirmed. The judgment in favor of Ford Motor Company is also affirmed.
The damage judgments in favor of Mickey Maitre, Alton Sartin, and Mark Abadie are reduced to $1,660,576.75; $150,000; and $234,839.50, respectively. Additionally, the damage judgments in favor of Patrick Prigmore and Kevin Reynolds are increased to $121,673.08 and $54,781.60, respectively. All other damage awards are affirmed. Delgado/State is cast in judgment for 100 percent of all damage awards.
AFFIRMED IN PART; REVERSED IN PART; AMENDED.
NOTES
[1] These cases were overruled by the Louisiana Products Liability Act, LSA-R.S. 9:2800.51 et seq., which became effective September 1, 1988. However, since this case arose prior to the effective date of the act, the principles established in the cases cited control.
[2] The Louisiana Supreme Court's adoption of the Daubert standard overrules this court's previous decision in Adams v. Chevron U.S.A., Inc., 589 So.2d 1219 (La.App. 4th Cir.), writ denied 592 So.2d 414 and 415 (La.1992), which adopted the four-part test for admission of expert testimony established by the United States Fifth Circuit Court of Appeal in Christophersen v. Allied-Signal Corp., 939 F.2d 1106 (5th Cir.), cert. denied ___ U.S. ___, 112 S.Ct. 1280, 117 L.Ed.2d 506 (1992).
[3] Our finding that the trial court improperly allowed Dr. Ehrlich to testify concerning the manufacture of the tire in question, coupled with the finding that the improper admission of that testimony was prejudicial to Goodyear, is sufficient grounds for reversal of the judgment against Goodyear by itself. Thus, we are not required to consider the other issues presented by Goodyear. However, because the trial judge committed compound errors which inured to the detriment of Goodyear, we will discuss the other issues.
[4] Goodyear also complains about the inclusion of a jury instruction relative to "foreseeable misuse" of the product, claiming that the plaintiffs failed to present any evidence on that issue. Additionally, Goodyear claims that the trial judge improperly refused to give its requested instruction limiting the jury's consideration of Goodyear's liability to whether the "glass-like black object" constituted a defect. Goodyear also contests the omission of its requested instruction that a manufacturer may presume that usage instructions for its product will be followed, as well as its requested instruction that the occurrence of a blowout neither proves nor raises an inference of a defect in the tire. Because we find the instruction quoted so improper and misleading as to constitute reversible error by itself, we pretermit discussion of the other jury instruction issues.
[5] In brief, the plaintiffs seek to undermine the principle of law cited in these cases that the fact that a blowout occurs is insufficient to prove that the tire in question was defectively manufactured. Plaintiffs claim that the Traut case is factually distinguishable and point out that the Williams case was decided 13 years prior to the seminal Louisiana case on strict products liability, Weber v. Fidelity & Casualty Insurance Co., 259 La. 599, 250 So.2d 754 (La.1971), apparently suggesting that the general principle of law stated in those cases is affected by those considerations. However, the plaintiffs ignore the Broussard case. Moreover, none of the circumstances cited by the plaintiffs change the basic principle of law applicable to those cases and to the case at hand. Generally, the fact that a blowout has occurred is insufficient by itself to prove that the tire was defective.

The plaintiffs further allege that the decision in Rougeau v. Sears, Roebuck, & Co., 383 So.2d 141 (La.App. 3d Cir.1980) questions the validity of that principle of law. We disagree. At no place in the Rougeau case does the court even suggest that the occurrence of the blowout by itself might be sufficient to prove that the tire contained a defect. The Rougeau decision is based solely on the principle that granting a motion for summary judgment is improper if any genuine issue of material fact remains, even if the court believes the party opposing the motion will be unable to prove his case in court.
[6] We are aware of the general principle of law that an appellate court must consider the jury instructions as a whole when trying to determine whether those instructions were so incorrect or deficient as to constitute reversible error. Brown v. White, 405 So.2d 555, 558 (La.App. 4th Cir. 1981), aff'd 430 So.2d 16 (La.1982). We are also aware that the trial judge in this case properly recited the elements of a cause of action in strict products liability, as established by Halphen, 484 So.2d at 113 and Bell, 462 So.2d at 168, in a different portion of the jury instructions. Thus, we would not hold that the jury instructions, by themselves, are so incorrect or deficient as to constitute reversible error. However, our inquiry in this case is different. Here, we are called upon to determine whether the incorrect statements in the jury instruction, when coupled with other trial errors, prejudiced the jury, essentially encouraging the jury to find liability on the part of Goodyear.
[7] Our finding that the record supports the trial court judgment that Delgado/State is liable for negligently causing the accident for its improper maintenance of the failed tire would be sufficient to affirm the judgment against Delgado/State. Thus, it is technically unnecessary for us to review the other theories of liability advanced against Delgado/State. However, because of the fact that the trial court judgment fails to specify the theory upon which it based Delgado/State's liability, we will go on to consider the other issues.
[8] A state educational institution is vicariously responsible for the negligence of student drivers when they operate vehicles on school-sponsored trips, like the trip in question in the instant case. Whittington v. Sowela Technical Institute, 438 So.2d 236, 246 (La.App. 3d Cir.), writ denied 443 So.2d 591 and 592 (La.1983). Thus, Delgado/State is liable for any negligence on the part of Griffin in the instant case.
[9] This figure was calculated by multiplying $165 for annual orthopedic care times Maitre's life expectancy of approximately 46 years.
[10] One of the assignments of error raised by Delgado/State on appeal is the trial court's failure to allow it to present evidence of medical expenses it had previously paid on behalf of the various plaintiffs. Further, Delgado/State contested the trial court's failure to award a specific credit for those amounts when issuing his judgment in the various damage trials. However, Delgado/State proffered uncontradicted evidence of the amount it paid on behalf of each of the plaintiffs. Since we find that Delgado/State is entitled to a credit for the medical expenses paid, we will grant a specific credit as a part of each damage award.
[11] This figure is calculated by adding $100,000 for the cognitive rehabilitation program, $25,000 for future shoulder joint replacement surgery, and $1,350 for medical and orthopedic care ($300 per year for 45 years).
[12] Dr. Pisarello testified that Abadie would need either a disketomy, at a cost of approximately $15,000, or a spinal cord fusion, at a cost of approximately $30,000. Since there is some speculation concerning the exact nature of the surgery which will be needed, we have decided that $25,000 is the highest amount which could be awarded for this item of damages.
[13] The record on appeal did not contain the exhibits documenting Ayo's medical expenses. However, the defendants admitted in brief that Ayo's past medical expenses totalled approximately $1,600; therefore, we have adopted that number.